## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF GEORGIA
### BRUNSWICK DIVISION

| | |
|---|---|
| In re:<br><br>**SEA ISLAND COMPANY et al.,**<br><br>     **Debtors.** | **Chapter 11**<br>**Case No. 10-21034-EJC**<br>**Jointly Administered** |
| **SEA ISLAND ACQUISITION, LLC, SEWERS AND WELLS, LLC, MAINTENANCE FACILITY, LLC, LAUNDRY SERVICES, LLC, RAINBOW HAMMOCK, LLC, SIA PROPCO I, LLC, SIA PROPCO II, LLC, SI TRACT V, LLC, SI PARCEL OGC, LLC, AND SSI PARCEL OS, LLC,**<br><br>     **Plaintiffs,**<br><br>**v.**<br><br>**ROBERT H. BARNETT, as Trustee of the SEA ISLAND COMPANY CREDITORS LIQUIDATION TRUST,**<br><br>     **Defendant.** | **Adversary Proceeding**<br><br>**No. 18-02012-EJC** |

## <u>SECOND AMENDED COMPLAINT</u>

Pursuant to Rules 7001 and 9014 of the Federal Rules of Bankruptcy Procedure and § 105 of the Bankruptcy Code, 11 U.S.C. § 105, and based on prior orders and proceedings of this Court described herein, Plaintiff Sea Island Acquisition, LLC ("<u>SIA</u>") and the other plaintiffs party to this adversary proceeding (together with SIA, the "<u>Plaintiffs</u>") by and through the undersigned counsel, bring this Second Amended Complaint: (1) to obtain a declaration that a settlement agreement and an order of this Court approving that settlement agreement do not affect or pertain to any assets or interests of Plaintiffs other than the "Cabin Bluff Reserved

Interests" (as defined and described herein), or, in the alternative, for rescission of the settlement agreement and vacatur of the order approving the settlement agreement; (2) to obtain modification of the order approving the settlement agreement; (3) to remove of a cloud on title to real property caused by Defendant's improper interpretation and use of certain documents, as well as appropriate injunctive and other relief; and (4) to obtain a declaration that Defendant did not acquire any interests in real property: (a) under the Asset Purchase Agreement between the Debtors and SIA (described fully herein); (b) under the Plan or the Confirmation Order (as those terms are defined below); (c) at the closing of the transactions contemplated by that Asset Purchase Agreement; or (d) otherwise upon the effective date of the Plan.  In support thereof, the Plaintiffs respectfully state as follows:

## PARTIES

1.     Plaintiff SIA is a limited liability company organized and existing under the laws of the State of Delaware and having its principal place of business at 351 Sea Island Drive, St. Simons, Georgia 31522.  SIA was formerly known as Sea Island Acquisition, LP.

2.     Plaintiff Sewers and Wells, LLC is a limited liability company organized and existing under the laws of the State of Delaware and having its principal place of business at 351 Sea Island Drive, St. Simons, Georgia 31522.

3.     Plaintiff Maintenance Facility, LLC is a limited liability company organized and existing under the laws of the State of Delaware and having its principal place of business at 351 Sea Island Drive, St. Simons, Georgia 31522.

4.     Plaintiff Laundry Services, LLC is a limited liability company organized and existing under the laws of the State of Delaware and having its principal place of business at 351 Sea Island Drive, St. Simons, Georgia 31522.

5.     Plaintiff Rainbow Hammock, LLC is a limited liability company organized and existing under the laws of the State of Delaware and having its principal place of business at 351 Sea Island Drive, St. Simons, Georgia 31522.

6.     Plaintiff SIA Propco I, LLC is a limited liability company organized and existing under the laws of the State of Delaware and having its principal place of business at 351 Sea Island Drive, St. Simons, Georgia 31522.

7.     Plaintiff SIA Propco II, LLC is a limited liability company organized and existing under the laws of the State of Delaware and having its principal place of business at 555 17th Street, Suite 2400, Denver, Colorado 80202.

8.     Plaintiff SI Tract V, LLC is a limited liability company organized and existing under the laws of the State of Delaware and having its principal place of business at 555 17th Street, Suite 2400, Denver, Colorado 80202.

9.     Plaintiff SI Parcel OGC, LLC is a limited liability company organized and existing under the laws of the State of Delaware and having its principal place of business at 555 17th Street, Suite 2400, Denver, Colorado 80202.

10.     Plaintiff SSI Parcel OS, LLC is a limited liability company organized and existing under the laws of the State of Delaware and having its principal place of business at 555 17th Street, Suite 2400, Denver, Colorado 80202.

11.     Defendant Robert H. Barnett ("Defendant") is the Trustee of the Sea Island Company Creditors Liquidation Trust (the "Liquidating Trust"), and he is named as Defendant herein in that capacity.  At the time of his appointment as Trustee, Defendant was a managing director of Conway MacKenzie, Inc., which has an office at 1075 Peachtree Street N.E., Suite 3675, Atlanta, Georgia 30309.  Upon information and belief, Defendant is no longer employed

by Conway MacKenzie, Inc., and correspondence sent to Defendant at Conway MacKenzie, Inc.'s office have been returned as undeliverable. The following address is listed as Defendant's address in Defendant's last Quarterly Operating Report to the Court, dated October 19, 2018 (Bankruptcy Case Dkt. 1757): P.O. Box 19958, Atlanta, Georgia 30325. Defendant's attorney is Robert Mercer of the law firm Schulten Ward Turner & Weiss, with its office located at 260 Peachtree Street, N.W., Suite 270, Atlanta, Georgia 30303. Defendant's attorney ignored SIA's request for Defendant's current address. Defendant can be served with process and all other notices care of his attorney.

## JURISDICTION AND VENUE

12.     This Court has original jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 because: it arises under Title 11 of the United States Code; it arises in or relates to the above-referenced Chapter 11 case filed in this Court, *In re Sea Island Company et al.*, Case No. 10-21034 (S.D. Ga. Brunswick Division) (the "Bankruptcy Case"); it arises from or relates to the implementation, interpretation, and/or enforcement of the Court's Findings of Fact, Conclusions of Law, and Order Confirming the Amended and Restated Joint Chapter 11 Plan as of August 10, 2010 Filed by the Debtors (Bankruptcy Case Dkt. 372); and it arises from or relates to the implementation, interpretation, and/or enforcement of the Court's December 15, 2015 Amended Order Granting the Motion to Approve the Compromise and Settlement Pursuant to Federal Rule of Bankruptcy Procedure 9019, entered in the Bankruptcy Case (Bankruptcy Case Dkt. 1450), and the "Settlement Agreement" referenced therein.

13.     The Court has jurisdiction over this matter as a core proceeding under 28 U.S.C. § 157(b).

14.     Venue is proper in this Court under 28 U.S.C. § 1409(a) because it arises under, arises in, and/or relates to the Bankruptcy Case filed in this Court.

## SUBSTANTIVE ALLEGATIONS

### Filing of the Bankruptcy Petitions and the Plan

15.     On August 10, 2010, Sea Island Company and six of its affiliates (collectively, the "Debtors") filed Chapter 11 petitions in this Court, all of which were jointly administered in the Bankruptcy Case.

16.     Before the Bankruptcy Case, the Debtors were engaged in operating a resort business in and around Sea Island, Georgia, including the properties known as the Cloister, the Sea Island Beach Club, and The Lodge together with several golf courses and numerous related facilities.

17.     The purpose of the Bankruptcy Case was to consummate a sale of substantially all of the Debtors' assets pursuant to a Court-approved sale and plan process.

18.     On September 24, 2010, the Debtors filed their Amended and Restated Joint Chapter 11 Plan (the "Plan"), and on October 19, 2010, the Debtors filed their Plan Supplement supplementing certain information in the Plan.  A true and correct copy of the Plan is at Docket No. 217 of the Bankruptcy Case docket, and a true and correct copy of the Plan Supplement is at Docket No. 294 of the Bankruptcy Case docket.

19.     The Plan provided for the sale of substantially all of the Debtors' assets, including all real property interests of the Debtors, to the successful bidder at a Court-approved auction. The Plan also provided for the transfer of certain cash and causes of action owned by the Debtors to the Liquidating Trust.

20.     The Plan states, among other things, as follows:

> Section 7.01 The Sale. This Plan contemplates the Sale of substantially all of the Debtors' assets to a Purchaser (as more fully outlined in the Sale and Bid Procedures) pursuant to sections 365, 1123(b)(4), 1129(b)(2)(A), 1145 and 1146(a) of the Bankruptcy Code, and provides for the orderly distribution of the Sale

Proceeds as well as the proceeds or rights in the Accepting Unsecured Creditor Fund and the General Unsecured Creditor Fund under the terms and conditions of this Plan. . . .  The Sale shall be consummated pursuant to this Plan.

In accordance with this Plan, the Debtors and the Purchaser shall, prior to the Effective Date, take all steps necessary to consummate the Sale in accordance with the Sale and Bid Procedures Order and this Plan.  On the Closing Date, pursuant to the Asset Purchase Agreement, the Debtors shall transfer the Purchased Assets to the Purchaser for the aggregate consideration of the Purchase Price plus the assumption by the Purchaser of the Assumed Liabilities.  Pursuant to the Sale, the Debtors will transfer the Purchased Assets to the Purchaser free and clear of all Liens . . . .

21.     "Sale" is defined in the Plan as "the sale of certain or substantially all of the

Debtors' assets under or in connection with the Plan and the Asset Purchase Agreement."

22.     The Plan provides, among other things, the following:

Section 9.02   <u>Conditions to Effective Date</u>.  The Plan shall not be consummated, and the Effective Date shall not occur, unless and until the following conditions have occurred or been duly waived (if waivable) pursuant to Section 9.03 below:

. . .

(d) the transactions contemplated in the Asset Purchase Agreement have been consummated . . . .

Section 9.03   <u>Waiver of Conditions to Consummation</u>. The conditions to consummation in Section 9.02 (other than Sections 9.02(a), (b) and (d)) may be waived at any time by a writing signed by an authorized representative of each of the Debtors without notice or order of the Bankruptcy Court or any further action other than proceeding to consummation of the Plan.

23.     Consummation of all "transactions contemplated in the Asset Purchase

Agreement," including the "Sale," was an unwaivable condition to consummation of the Plan.

## Sale of the "Purchased Assets" to SIA Under the APA and the Plan

24.     On September 15, 2010, the Court entered its Order (A) Authorizing and Scheduling an Auction at Which Debtors Will Solicit the Highest or Best Bid for the Sale of Substantially All of Debtors' Assets, (B) Approving Procedures Related to Conduct of Auction, (C) Approving Break-Up Fee, (D) Fixing the Manner and Extent of Notice, and (E) Granting Related Relief (the "Bid Procedures Order").   A true and correct copy of the Bid Procedures Order is at Docket No. 190 of the Bankruptcy Case Docket.

25.     In its Bid Procedures Order, the Court set forth the process for the Debtors' conducting a sale of their assets and approving the form of asset purchase agreement to be entered into by the successful bidder at the auction.

26.     On October 11, 2010, as required by the Bid Procedures Order, the Debtors conducted the auction for the sale of substantially all of the Debtors' assets—including all right, title, and interest of the Debtors in and to all of their real property.   Multiple bidders engaged in multiple rounds of bidding, and the auction ultimately culminated in a bid by SIA that was accepted as the highest and best bid.

27.     Following the auction, SIA and the Debtors entered into an Asset Purchase Agreement dated October 19, 2010 (the "APA").   A true and correct copy of the form of the APA that was filed of record in the Bankruptcy Case is at pages 4 through 139 of Docket No. 293, along with pages 4 through 54 of Docket No. 295, of the Bankruptcy Case docket.

28.     Pursuant to the APA, SIA agreed to purchase, and the Debtors agreed to sell—subject to confirmation of the Plan—the "Purchased Assets," as defined in the APA, for $210,723,720 in cash (prior to certain working-capital adjustments and other adjustments) plus the assumption by SIA of more than $150 million in certain liabilities of the Debtors.

29.     Pursuant to the APA, SIA purchased " . . . all land, together with all . . . rights and interests appurtenant thereto owned by any Seller."  This simple fact is made clear in the APA. The APA provides, among other things, as follows:

>     2.1.    <u>Purchase and Sale</u>.  Subject to and upon the terms and conditions set forth in this Agreement, at the Closing, Sellers shall sell, transfer, convey, assign and deliver, or cause to be sold, transferred, conveyed, assigned and delivered, to Purchaser, and Purchaser shall purchase, acquire and accept from Sellers, on an "as is, where is" basis and without any representation or warranty on the part of Sellers as to fitness, merchantability or otherwise, all right, title and interest of Sellers in and to the following assets, properties and rights (the "<u>Purchased Assets</u>"), free and clear of all Liens (other than Permitted Liens and Assumed Liabilities):
>
>     (a) the Acquired Owned Real Property; . . . [and]
>
>     (p) all other assets, properties, rights and claims, whether tangible or intangible, whether personal or mixed, whether accrued, contingent or otherwise that are reflected on the Balance Sheet.
>
>     2.2.    <u>Excluded Assets</u>.  Notwithstanding any other provision of this Agreement to the contrary, the Purchased Assets shall not include the following (the "<u>Excluded Assets</u>"): . . .
>
>     (c) the portion of the Owned Real Property set forth on Schedule 2.2(c), as such Schedule may be amended in accordance with Section 15.10 (the "<u>Excluded Owned Real Property</u>") . . . .

30.     The "Purchased Assets" under APA thus included, but were not limited to, the "Acquired Owned Real Property" and "all other assets, properties, rights and claims" of the Debtors, with the exception of the "Excluded Assets," which included the "Excluded Owned Real Property."

31.     The APA defines the "Acquired Owned Real Property" as, among other things, "all of the Owned Real Property . . . but excluding the Excluded Owned Real Property."

32.     The APA defines the "Owned Real Property" as "all land, together with all Improvements located thereon and all easements, rights of way, servitudes, tenements,

hereditaments, appurtenances, privileges and other rights and interests appurtenant thereto owned by any Seller."

33.     Schedule 2.2(c) of the APA, describing any "Excluded Owned Property," says simply "None."

34.     The APA provided for the sale of all real property interests of the Debtors to SIA (or its designees).

35.     In an order entered on March 4, 2016 (Bankruptcy Case Dkt. 1494), the Court confirmed that the APA provided for the transfer of all real property interests of the Debtors to SIA (or its designees).

36.     The Plan, the Confirmation Order, and the APA required the Debtors to deliver, at the closing of the purchase and sale transaction in the APA (the "Closing"), deeds to SIA (or its designee) conveying to SIA (or its designee) all of the real property and real property rights of the Debtors.

37.     On November 8, 2010, the Court entered its Findings of Fact, Conclusions of Law, and Order Confirming the Amended and Restated Joint Chapter 11 Plan as of August 10, 2010 Filed by the Debtors (the "Confirmation Order") in which the Court confirmed the Plan.  A true and correct copy of the Confirmation Order is at Docket No. 372 of the Bankruptcy Case docket.

38.     The Confirmation Order approved the APA and authorized and compelled the Debtors to proceed with consummation of the transactions under the APA.

39.     In Paragraph 8 of the Confirmation Order, the Court directed and ordered the Debtors and the Liquidating Trustee to execute, deliver, and record all documents necessary to consummate the Plan in accordance with its terms.

40.     The Confirmation Order was filed in the real property records of the counties in which the Debtors' real property was located: Glynn County, Georgia and Camden County, Georgia.

41.     On December 15, 2010, the Closing occurred.

42.     At Closing, the Debtors executed a Bill of Sale, Assignment and Assumption Agreement (the "Bill of Sale"), which assigned all of the "Purchased Assets" (as defined in the APA), including all real property interests owned by the Debtors, to SIA and its designees.

43.     At Closing, the Debtors also delivered deeds to SIA (and its designees) conveying to SIA (and/or its designees) all real property interests then known to SIA as belonging to the Debtors (the "Deeded Property").  SIA thereafter recorded those deeds (the "Deeds").

44.     At Closing, no real property or real property interest of any kind was transferred to the Liquidating Trust.

45.     On December 16, 2010, as the sale of the Debtors' assets under the APA had occurred, the Plan was substantially consummated.

46.     On December 17, 2010, a notice of such consummation was filed with the Court at Docket No. 444 of the Bankruptcy Case.

47.     The real property transferred to SIA and its designees at the Closing included, among other things, the Cloister (a five-star resort located in Sea Island, Georgia), the Sea Island Beach Club, The Lodge (a full service golf resort located in St. Simons, Georgia), the Debtors' four award-winning golf courses (Ocean Forest Golf Course, The Plantation Golf Course, the Retreat Golf Course, and Seaside Golf Course), the 150-acre Ocean Forest Development, and various other commercial and residential properties.

48.     A description of certain of the real property transferred to SIA (or its designee) by the Debtors was attached at Schedules 1.1(mmm), 2.1(a), 3.11(a), and 3.11(b) to the Disclosure Schedule to the APA (appearing at pages 4 to 6 and 48 to 56 of the Disclosure Schedule to the APA) (together with the Deeded Property, the "Identified Property").

49.     Notwithstanding the execution of the Deeds, and notwithstanding whether the Deeds contained any errors, the APA, the Bill of Sale, and the Confirmation Order were sufficient to transfer to SIA (and/or its designees) all right, title, and interest of the Debtors in their real property, including all of the Identified Property.

50.     The APA requires the Debtors to execute and deliver any documents necessary to vest SIA (and its designees) with good title in the Purchased Assets.  *See* APA § 7.1.

## Establishment of the Liquidating Trust

51.     The Plan further provided for the establishment of the Liquidating Trust to receive and to distribute to creditors certain assets of the Debtors not conveyed to SIA under the APA.

52.     The Liquidating Trust was created pursuant to a Trust Agreement (Bankruptcy Case Dkt. 449-1) that became effective on December 16, 2010.

53.     No deeds for the transfer of real property were executed by any Debtor in favor of the Liquidating Trust or Defendant at any time.

## Post-Closing Discovery of Additional "Purchased Assets"

54.     At the time of the Closing, various individuals related to the Jones family, the prior owners of the Debtors, owned fee interests in real property located in Camden County, Georgia and known as Cabin Bluff.  Certain of those parcels had (unbeknownst to SIA) been transferred years earlier to the Jones family members subject to certain reversionary interests in favor of the Debtors (the "Cabin Bluff Reserved Interests").

55.     After the Closing, the Jones family members, who sought to sell their fee interests contacted SIA to request that SIA release the Cabin Bluff Reserved Interests.  The Cabin Bluff Reserved Interests included certain mineral and timber rights, rights of first refusal upon resale, and other encumbrances.

56.     SIA analyzed the Cabin Bluff Reserved Interests and concluded that other than as "hold up" value against the Jones family members who sought to sell the fee interests subject to the Cabin Bluff Reserved Interests, the Cabin Bluff Reserved Interests had no monetary value. As a result, SIA agreed to transfer the Cabin Bluff Reserved Interests that it had acquired under the Plan, the APA, the Bill of Sale, and the Confirmation Order to the Jones family members to ensure that they had clean title to their properties.

57.     In addition, several years before the Bankruptcy Case commenced, the Debtors developed a subdivision in Glynn County, Georgia known as Kings Point.  The common areas for the subdivision (the "Kings Point Common Areas") were owned by the Debtors.  Sometime before the filing of the Bankruptcy Case, as is typical when lot sales in a development reach a certain level, the Debtors, as developer, conveyed ownership of the Kings Point Common Areas to the subdivision's property owners' association, Kings Point Property Owners Association, Inc. ("Kings Point POA").

58.     At the time of the filing of the Bankruptcy Case in 2010, the Debtors were unaware that the deed that was issued years earlier and that purportedly conveyed the Kings Point Common Areas was ineffective because it was mistakenly issued by the incorrect Debtor. As a result, the Debtors did not list the property on their schedules and did not prepare a corrective deed to convey the property to SIA.

59.     Because legal title to the Kings Point Common Areas remained in the Debtors' estates at the time that the Plan was consummated, title to the Kings Point Common Areas was transferred to SIA under the Plan, the APA, the Bill of Sale, and the Confirmation Order.

60.     Years after the Closing, the error in the deed was discovered when certain of the Kings Point homeowners wanted to sell their real property.  Because the Kings Point Common Areas had no commercial value to SIA and because it would have been inappropriate to extort hold up value over property that the Debtors clearly intended to transfer prior to the bankruptcy, SIA agreed to voluntarily convey the Kings Point Common Areas to Kings Point POA.

61.     By letter dated November 22, 2013, SIA, through its counsel, contacted Defendant to request that the Liquidating Trust provide quit claim deeds with respect to the Cabin Bluff Reserved Interests.  Defendant refused to do so or otherwise to waive any claim to those interests, and instead, asserted the right to exclusive control over the Cabin Bluff Reserved Interests.

### SIA's Motion to Clarify and the Contested Matter

62.     On March 18, 2014, SIA filed its Motion to Clarify Provisions Relating to Implementation of the Confirmed Plan (Bankruptcy Case Dkt. 1102) (the "Motion to Clarify") seeking clarification from the Court that the Cabin Bluff Reserved Interests and the Kings Point Common Areas were "Purchased Assets" under the APA and a ruling that "any interests and property of Debtors sold to [SIA], but not properly transferred to [SIA], or its assignee, at the Closing under the [APA], whether identified and known as of this date or in the future, shall be transferred by Debtors to [SIA], or its assignee."

63.     On March 20, 2014, Defendant filed a "preliminary response" to the Motion to Clarify, requesting that the Court apply Rule 7016 of the Federal Rules of Bankruptcy Procedure

to the proceeding initiated by the Motion to Clarify (the "Contested Matter") and allow discovery in the Contested Matter.

64.     On April 10, 2014, the Court held a hearing on the Motion to Clarify and Defendant's request for discovery.

65.     At the April 10, 2014 hearing, the Court expressly limited the Contested Matter to two "instances" of property interests—the Cabin Bluff Reserved Interests and the Kings Point Common Areas—and refused to expand the Contested Matter to include all "Purchased Assets" under the APA.  The Court granted Defendant's request for discovery in the Contested Matter and allowed the parties to engage in discovery with respect to the Cabin Bluff Reserved Interests and the Kings Point Common Areas.

66.     On May 16, 2014, Kings Point POA filed a response to the Motion to Clarify and asserted, consistent with the Motion to Clarify, that the Kings Point Common Areas were conveyed to SIA under the APA and that SIA therefore could properly convey the Kings Point Common Areas to Kings Point POA.  The Court permitted Kings Point POA to intervene in the Contested Matter.

67.     Although the Contested Matter thereafter proceeded as a contested matter, it should have been brought and treated as an adversary proceeding, under Rule 7001(2) of the Federal Rules of Bankruptcy Procedure, as it was an action to determine the extent of an interest in property.

### SIA's and Defendant's Settlement of the Contested Matter

68.     Defendant indicated to the Court (at the April 10, 2014 hearing) and separately to SIA that he intended to engage in significant discovery in the Contested Matter, thus forcing SIA to incur substantial expense to determine title to property in which it sought no commercial interest.

69.     After approximately one year of discovery, SIA decided to settle the Contested Matter because it determined that continuing to litigate over the Cabin Bluff Reserved Interests and the Kings Point Common Areas, while a noble pursuit, was not worth the cost of litigation.

70.     SIA agreed that it would not assert ownership rights with respect to the Cabin Bluff Reserved Interests or the Kings Point Common Areas, fully expecting that Kings Point POA would continue to litigate ownership of the Kings Point Common Areas.

71.     On August 19, 2015, SIA and Defendant entered into an agreement (the "Settlement Agreement") to settle the Contested Matter.   A true and correct copy of the Settlement Agreement is at pages 10 through 21 of Docket No. 1409 of the Bankruptcy Case docket.

72.     ***Neither SIA nor Defendant received cash or any other property interest as consideration under the Settlement Agreement.*** Instead, SIA and Defendant provided mutual releases, and SIA agreed not to assert property ownership rights in the Cabin Bluff Reserved Interests or the Kings Point Common Areas.

73.     On October 16, 2015, Defendant unilaterally filed a motion seeking approval of the Settlement Agreement, along with a proposed negative-notice order providing, among other things, that "neither SIA nor its affiliates have assigned, transferred, conveyed, or encumbered SIA's Asserted Contested Matter Rights in any way."

74.     On October 19, 2015, the Court entered Defendant's proposed negative-notice order and directed that any objections be filed within 21 days.

75.     On November 4, 2015, SIA filed a timely objection to the negative-notice order on the ground that the order was potentially ambiguous insofar as it did not clarify that "SIA's

Asserted Contested Matter Rights" should exclude the Kings Point Common Areas, which SIA already had purported to convey by deed to Kings Point POA.

76.     In response to SIA's objection and objections filed by others, the Court entered, on December 15, 2015, its Amended Order Granting the Motion to Approve the Compromise and Settlement Pursuant to Federal Rule of Bankruptcy Procedure 9019 (the "Settlement Order").   A true and correct copy of the Settlement Order is at Docket No. 1450 of the Bankruptcy Case docket.

### Kings Point POA's Continued Litigation of the Contested Matter

77.     Following the Court's entry of the Settlement Order, Kings Point POA and Defendant continued to litigate their respective positions with respect to the Kings Point Common Areas.

78.     On March 4, 2016, following a hearing on the merits of the remaining issues in the Motion to Clarify, the Court entered an Opinion and Order on Sea Island Acquisition's Motion to Clarify (the "Order on Motion to Clarify") granting the Motion to Clarify and ruling that the Liquidating Trust had received no interest whatsoever in any real property of the Debtors pursuant to the terms of the Plan.  A true and correct copy of the Order on Motion to Clarify is at Docket No. 1494 of the Bankruptcy Case docket.

79.     The Order on Motion to Clarify holds, among other things, that, by virtue of "the plain and unambiguous terms of the APA," the Kings Point Common Areas were among the "Purchased Assets" to be acquired by SIA under the APA, that "none" of the real property of the Debtors vested in the Liquidating Trust, and that "all" real property of the Debtors constituted "Purchased Assets" under the APA and was subject to conveyance by the Debtors to SIA.

80.     The Court thus ordered that the Kings Point Common Areas be conveyed by deed to SIA and that Kings Point POA thereafter could record its deed, previously received from SIA, for the property.

81.     On April 4, 2016, Defendant filed a Notice of Appeal with respect to the Bankruptcy Court's Order on Motion to Clarify, which commenced an appeal of that order to the United States District Court for the Southern District of Georgia.

82.     The Defendant did not seek a stay of the Order on Motion to Clarify pending appeal.  Accordingly, the Order on Motion to Clarify remains in effect.

83.     During the appeal, the Defendant and the Kings Point POA reached an agreement in principle to settle the appeal.  Although both parties represented to the District Court that a settlement had been reached, Defendant later refused to enter into a definitive settlement agreement unless the agreement was conditioned upon the entry of an order by the Court vacating the Order on Motion to Clarify (a requirement that had not been discussed when the parties reached their agreement to settle).

**<u>Defendant's Recent Claim to All "Purchased Assets"</u>**

84.     At all times on and after December 16, 2010, including in the years after the entry of the Settlement Order, SIA continuously and exclusively exercised all incidents of ownership over the Identified Property—for which it paid more than $210 million and incurred more than $150 million in assumed liabilities—including by occupying the Identified Property, investing more than $170 million in new capital in the Identified Property, using the Identified Property in connection with SIA's business, maintaining the repair of the Identified Property, paying all assessed taxes on the Identified Property, maintaining utilities with respect to the Identified Property, insuring the Identified Property, and reflecting the ownership of the Identified Property on its books and records.

85.     In addition, in the years prior to and after the entry of the Settlement Order, SIA also transferred, conveyed, and/or encumbered various portions of the Identified Property, some of which was held for sale, including as follows:

- SIA (and its designees) have sold dozens of lots acquired from the Debtors since the Closing;

- SIA (and its designees) also conveyed property before and after the Settlement Agreement to other affiliates and related parties; and

- In 2014, SIA and certain of its affiliates also executed a deed to secure debt with respect to a significant amount of the Identified Property to Metropolitan Life Insurance.

86.     Upon information and belief, Defendant was aware of, and was on inquiry notice of, one or more these transfers and/or assignments, and he never sought to set aside or otherwise challenge any such transfers and/or assignments.

87.     Defendant has never exercised ownership over the Identified Property or over any other property constituting the "Purchased Assets":

(a)     Defendant never requested, obtained, or recorded a deed purporting to convey to the Liquidating Trust the Identified Property or any of the other "Purchased Assets";

(b)     Defendant never occupied or used the Identified Property or any of the other "Purchased Assets";

(c)     Defendant never purchased or otherwise obtained title insurance with respect to the Identified Property or any of the other "Purchased Assets";

(d)     Defendant never purchased or otherwise obtained property insurance covering any portion of the Identified Property or any of the other "Purchased Assets";

(e)      Defendant never paid taxes assessed on the Identified Property or any of the other "Purchased Assets"; and

(f)      Defendant never attempted to maintain, repair, or care for the Identified Property or any of the other "Purchased Assets."

88.      In June 2018, SIA learned that Defendant had represented to multiple Sea Island property owners that the Liquidating Trust owned or otherwise had an interest in the "Purchased Assets" and that Defendant entered into various transactions with those property owners.

89.      For example, Defendant has engaged in the following conduct:

(a)      In 2016, Defendant asserted rights to certain "rights of first refusal" retained by the Debtors (and transferred to SIA in 2010 as one of the "Purchased Assets") in real property owned by Katharine and Paul O'Connor and thereby frustrated the O'Connors' sale of the property to S. Taylor Glover and/or Cheapside, Inc.  Defendant forced the parties to pay $275,000 to the Liquidating Trust in exchange for a quitclaim deed relinquishing Defendant's asserted rights.

(b)      In 2016, Defendant asserted certain rights originally belonging to the Debtors (and transferred to SIA in 2010 as one of the "Purchased Assets") in real property owned by Gregory and Jennifer Holcomb and thereby frustrated the Holcombs' sale of the property to a third-party.  Defendant forced the parties to pay $100,000 to the Liquidating Trust in exchange for a quitclaim deed relinquishing Defendant's asserted rights.

(c)      In 2017, Defendant asserted ownership of certain marsh-front real property originally belonging to the Debtors (and transferred to SIA in 2010 as one of the "Purchased Assets") located in Glynn County, Georgia and adjacent to certain property

owned by Cottage 429, LLC.  When Cottage 429, LLC sought to acquire the marsh-front property adjacent to its own property, Defendant forced Cottage 429, LLC to pay $66,000 to the Liquidating Trust in exchange for a quitclaim deed relinquishing Defendant's asserted ownership.

90.     Defendant continues to represent to others that the Liquidating Trust owns or otherwise has interests in the "Purchased Assets," thus clouding Plaintiffs' title to the "Purchased Assets."

91.     In a letter dated June 14, 2018 from Defendant's attorney Robert Mercer to SIA's general counsel (the "June 14, 2018 Letter"), Defendant asserted to SIA for the first time that the Settlement Agreement and the Settlement Order pertain not only to the Cabin Bluff Reserved Interests but to all of the "Purchased Assets" under the APA—that is, Defendant asserted that SIA relinquished, and agreed to be enjoined from asserting, its ownership rights with respect to the "Purchased Assets."  A true and correct copy of the June 14, 2018 Letter is attached hereto as Exhibit A.

92.     On June 18, 2018, following a request by SIA's counsel for more information on Defendant's position, Defendant's attorney sent a letter (the "June 18, 2018 Letter") to SIA's counsel again asserting that the Settlement Agreement and the Settlement Order pertain to all of the "Purchased Assets" under the APA.  Specifically, the June 18, 2018 Letter asserts that the term "SIA's Asserted Contested Matter Rights," as used in the Settlement Agreement and the Settlement Order, means all of the "Purchased Assets" because SIA "asserted" its general right to the "Purchased Assets" in the Contested Matter.  A true and correct copy of the June 18, 2018 Letter is attached hereto as Exhibit B.

93.     In a third letter dated August 22, 2018 from Defendant's attorney to SIA's general counsel (the "August 22, 2018 Letter"), Defendant reiterated his purported interpretation of the Settlement Agreement and the Settlement Order and suggested that SIA was in "criminal contempt" of the Settlement Order for not acquiescing to Defendant's purported interpretation of the documents.  A true and correct copy of the August 22, 2018 Letter is attached hereto as Exhibit C.

94.     SIA and Defendant have a material disagreement as to the meaning and effect of the Settlement Agreement and Settlement Order.

95.     The Settlement Agreement provides, in its Paragraph 1 in a section titled "Agreement Not to Contest," as follows:

> 1.  **Agreement Not to Contest**.  SIA on its behalf and behalf of all of its affiliates hereby covenants and agrees that it will not contest or oppose directly or indirectly in any way the relief Liquidation Trustee seeks in the Contested Matter or in any case, proceeding, or otherwise regardless of whether such contest or opposition occurs in or out of court with respect to all rights SIA asserts in the Motion to Clarify or otherwise in the Contested Matter including, but not limited to, the Reserved Interests (as that term is defined on page three of the Motion to Clarify) (all such rights shall be collectively referred to as the "SIA's Asserted Contested Matter Rights"); for the avoidance of doubt, SIA's Asserted Contested Matter Rights shall not include the Common Areas (as that term is defined in paragraph two of the Kings Point POA Preliminary Response), and nothing in the Agreement shall prejudice the rights of Kings Point POA or the Liquidation Trustee with respect to the Common Areas.  In addition, SIA on its behalf and behalf of all of its affiliates hereby covenants and agrees that it will not assign, transfer, or convey the SIA's Asserted Contested Matter Rights to any entity (as that term is defined in the Bankruptcy Code).

96.     SIA thus agreed, in the Agreement Not to Contest, that it would not continue to pursue "SIA's Asserted Contested Matter Rights," which is defined as "all rights SIA asserts in the Motion to Clarify or otherwise in the Contested Matter including, but not limited to, the

Reserved Interests (as that term is defined on page three of the Motion to Clarify)," but which does not include the Kings Point Common Areas.

97.     The definition of "SIA's Asserted Contested Matter Rights" references all rights SIA "asserts"—in the present tense—in the Motion to Clarify or in the Contested Matter.

98.     At the time of the execution of the Settlement Agreement, the only rights SIA was asserting in "the Motion to Clarify or otherwise in the Contested Matter" were the Cabin Bluff Reserved Interests and the Kings Point Common Areas.  Because the Kings Point Common Areas are separately excluded from the definition of the "SIA's Asserted Contested Matter Rights," that term encompasses only the Cabin Bluff Reserved Interests.

99.     The fact that the term "SIA's Asserted Contested Matter Rights" included only the Cabin Bluff Reserved Interests is reflected by and consistent with the inclusion in the Settlement Agreement of a representation and warranty by SIA whereby "SIA represents and warrants that it has not transferred or assigned SIA's Asserted Contested Matter Rights in any way whatsoever."  SIA could not have provided this representation and warranty if the term "SIA's Asserted Contested Matter Rights" included all the "Purchased Assets" (as defined in the APA).

100.     The restrictive meaning of "SIA's Asserted Contested Matter Rights" is further evidenced by the provision of the Settlement Order, which approved the Settlement Agreement, that:

> FURTHER ORDERED that neither SIA nor its affiliates have assigned, transferred, conveyed, or encumbered SIA's Asserted Contested Matter Rights in any way . . . .

101.     Any interpretation of "SIA's Asserted Contested Matter Rights" as encompassing all of the "Purchased Assets" under the APA, as asserted by Defendant, would result in the absurd outcome of having the Court order that certain conduct with respect to "SIA's Asserted

22

Contested Matter Rights," including good-faith transactions with third parties that had occurred in the past, did not in fact occur. There is no basis in fact or law for concluding that result was intended by SIA, Defendant (who is a fiduciary), or the Court.

102.   The Settlement Order further provides as follows:

> FURTHER ORDERED that, unless the Liquidation Trustee consents in writing, SIA and its affiliates are hereby barred from (i) assigning, transferring, or conveying SIA's Asserted Contested Matter Rights (as that term is defined in the Settlement Agreement) to any entity (as that term is defined in the Bankruptcy Code), (ii) contesting or opposing in any way the relief the Liquidation Trustee seeks or positions lie asserts in the Contested Matter, and (iii) contesting or opposing in any way the relief the Liquidation Trustee seeks or positions he asserts in any case, proceeding, or otherwise regardless of whether such contest or opposition occurs in or out of court with respect to SIA's Asserted Contested Matter Rights . . . .

103.   The Settlement Order thus enjoins certain conduct with respect to "SIA's Asserted Contested Matter Rights (as that term is defined in the Settlement Agreement)."

104.   There is no basis whatsoever for concluding that SIA agreed in the Settlement Agreement or otherwise to cede, convey, transfer, assign, or otherwise give up any interests or rights in any property other than the Cabin Bluff Reserved Interests and the Kings Point Common Areas—including the Identified Property or any other "Purchased Assets," which represents an investment by SIA of more than $530 million.

105.   In fact, nothing in the Settlement Agreement or the Settlement Order transfers or conveys any property interests of any kind other than the Cabin Bluff Reserved Interests.

106.   SIA never believed or understood—before, at the time of, or after the execution of the Settlement Agreement—that the Settlement Agreement purports to transfer or convey, or otherwise pertain to, any property interests or rights other than the Cabin Bluff Reserved Interests.

107.    Neither SIA nor any reasonable person would have entered into the Settlement Agreement if it had purported to transfer or convey, or otherwise pertain to, any property interests or rights other than the Cabin Bluff Reserved Interests.

108.    Despite representing that that the Liquidating Trust owns or otherwise has interests in the "Purchased Assets," and purporting to sell those interests to others, Defendant never has attempted to convey or transfer any purported interests in the "Purchased Assets" by warranty deed.

109.    Defendant now has demanded that SIA pay an exorbitant sum to the Liquidating Trust in exchange for not asserting a claim to the Identified Property or other "Purchased Assets" based on his purported interpretation of the Settlement Agreement and the Settlement Order.

110.    Defendant also has used, and continues to use, the Settlement Order (as he purports to interpret it) to frustrate SIA's day-to-day business in a further attempt to leverage a payment from SIA to the Liquidating Trust.

111.    On October 4, 2018, Defendant's counsel sent an email (the "October 4, 2018 Email") to Hunter MacLean Exley & Dunn, P.C., SIA's outside counsel for real estate transactions, and asserted that the firm had violated the Settlement Order by preparing and recording deeds on behalf of SIA affiliates conveying portions of the Identified Property.  A true and correct copy of the October 4, 2018 Email is attached hereto as Exhibit D.

112.    The October 4, 2018 Email states, among other things, as follows:

> As you can see, my September 4, 2018 email to Sarah Borders explains that the limited warranty deed (attached to that email) (the "Limited Warranty Deed") violates the SIA Consent Injunction (as defined in my attached June 18, 2018 letter to Sarah Borders). According to the face of the Limited Warranty Deed, it appears that Hunter Maclean Exley & Dunn, P.C. ("Hunter Maclean") prepared and recorded it.

We subsequently discovered the Moorman Conveyance. In such conveyance, SIA Propco I, LLC violated the injunction by purportedly conveying certain real property to Charles W. Moorman and Bonnie W. Moorman. According to the face of the Moorman Conveyance, it appears that Hunter Maclean also prepared and recorded it.

I have a prepared a formal letter to you in your capacity as Chief Executive Officer, Tom Cullen as Chief Financial Officer, and Frank Macgill as Registered Agent of Hunter Maclean Exley & Dunn, P.C. *See* FED. R. CIV. P. 65(d)(2) (injunction binds, among others, parties and their counsel).

113.    On October 5, 2018, the Defendant, through counsel, sent a letter (the "October 5, 2018 Letter") to James D. Benefield, III, Esq. asserting that a deed prepared and recorded by Mr. Benefield violates the Settlement Order. The deed at issue transferred property from SIA Propco II, LLC to Rick L. Burdick and Sharon F. Burdick. A true and correct copy of the October 5, 2018 Letter is attached hereto as Exhibit E.

114.    Defendant thus seeks to deprive Plaintiffs of their real estate counsel and to intimidate third parties into not entering into real estate transactions with Plaintiffs—in an effort to halt Plaintiffs' business until Plaintiffs make a payment.

115.    On October 5, 2018, Robert Mercer, counsel to the Defendant, wrote the Black Banks River Residences Condominium asserting that the Liquidating Trust owns the Resort Unit in the Black Banks River Residences, a Purchased Asset owned by SIA. A true and correct copy of the October 5, 2018, letter is attached hereto as Exhibit F (the "Black Banks Letter").

116.    In the Black Banks Letter, Mr. Mercer acknowledged that SIA contests the Trust's ownership of the Resort Unit (which was validly transferred to SIA under the Plan) but asserted that the Settlement Order enjoins SIA from contesting or opposing the position the Trustee asserts.

117.    In the Black Banks Letter, Mr. Mercer  made his strategy clear, writing, "Please let us know if you will help us obtain access to the Unit to increase the Trust's chances of reaching a consensual resolution with SIA in which the trust would Quitclaim the Unit to SIA in exchange for a cash payment."

118.    The Trustee, through counsel, is attempting to extract payment from SIA for property already conveyed to SIA in a court approved Plan.

## COUNT I – DECLARATION THAT THE SETTLEMENT AGREEMENT AND SETTLEMENT ORDER DO NOT PERTAIN TO OR AFFECT INTERESTS OTHER THAN THE CABIN BLUFF RESERVED INTERESTS

119.    Plaintiffs repeat, re-allege, and incorporate by reference, as if fully set forth herein, the allegations of each of the preceding paragraphs set forth above.

120.    The Settlement Agreement and the Settlement Order purport to pertain to or otherwise affect only "SIA's Asserted Contested Matter Rights."

121.    "SIA's Asserted Contested Matter Rights" is defined in such a way as to include only the Retained Interests and not any other "Purchased Assets" under the APA; however, Defendant asserts that the Settlement Agreement and the Settlement Order now should be interpreted such that the term "SIA's Asserted Contested Matter Rights," as used in them, includes some or all of the "Purchased Assets," including the Identified Property, in addition to the Cabin Bluff Reserved Interests.

122.    Defendant's purported interpretation of the Settlement Agreement and the Settlement Order is incorrect because, on their face, the Settlement Agreement and the Settlement Order do not purport to pertain to any property other than the Cabin Bluff Reserved Interests and do not purport to pertain to the Identified Property or to any other remaining "Purchased Assets."

123.    Defendant's purported interpretation of the Settlement Agreement and the Settlement Order also is incorrect because, even if the Settlement Agreement and the Settlement Order were ambiguous as to their effect on the Identified Property and/or all of the "Purchased Assets," all applicable rules of construction require interpreting the Settlement Agreement and the Settlement Order as pertaining only to the Retained Interests and not to the Identified Property or to any remaining "Purchased Assets".

124.    With respect to the interpretation and effect of the Settlement Agreement and the Settlement Order, there exists an actual controversy between Plaintiffs and Defendant, under 28 U.S.C. § 2201, that lies within the jurisdiction of this Court.

125.    Plaintiffs are entitled to the entry of a final judgment declaring that the Settlement Agreement and the Settlement Order purport to pertain to and/or affect only the Cabin Bluff Reserved Interests, and that neither the Settlement Agreement nor the Settlement Order purports to pertain to or affect the Identified Property or any of the other "Purchased Assets."

126.    Plaintiffs are further entitled to the entry of a final judgment declaring that the Debtors may convey corrective deeds and that Plaintiffs may record said corrective deeds without violating the Settlement Agreement or the Settlement Order.

### COUNT II – RESCISSION OF THE SETTLEMENT AGREEMENT

127.    To the extent the Settlement Agreement is found to pertain to or to affect property interests other than the Retained Interests, Plaintiffs plead this Count II in the alternative to the relief requested in Count I and repeat, re-allege, and incorporate by reference, as if fully set forth herein, the allegations of each of the preceding paragraphs set forth above.

128.    SIA entered into the Settlement Agreement on the understanding that the term "SIA's Asserted Contested Matter Rights" as used in the Settlement Agreement refers only to the

Cabin Bluff Reserved Interests and that the Settlement Agreement pertains to or affects only the Retained Interests.

129.    SIA never would have entered into the Settlement Agreement if it had understood that the Settlement Agreement pertained to or affected property interests other than the Cabin Bluff Reserved Interests.

130.    SIA and Defendant had no meeting of the minds with respect to an interpretation of the Settlement Agreement under which "SIA's Asserted Contested Matter Rights" includes the Identified Property or any other "Purchased Assets," other than the Cabin Bluff Reserved Interests, or under which the Settlement Agreement pertains to or affects property interests other than the Retained Interests.

131.    Moreover, to the extent the Settlement Agreement is found to pertain to or to affect property interests other than the Retained Interests, the Settlement Agreement impermissibly and ineffectively would purport to modify the Plan.  If all of the Purchased Assets are effected by the Settlement Agreement, the Settlement Agreement would constitute a substantial change of substance with respect to the transactions underlying the Plan, the purpose of which was to consummate the sale of the Debtors' assets.  The Plan has been substantially consummated.  Neither SIA nor Defendant moved to modify the Plan, and neither SIA nor Defendant had or has standing to modify the Plan.  Any such plan modification would violate 11 U.S.C. § 1127 and would be void or voidable.

132.    To the extent the Settlement Agreement is found to pertain to or to affect property interests other than the Retained Interests, the Settlement Agreement is void and/or voidable and should be rescinded.

## COUNT III –VACATUR OF THE SETTLEMENT ORDER

133.    To the extent the Settlement Order is found to pertain to or to affect property interests other than the Retained Interests, Plaintiffs plead this Count III in the alternative to the relief requested in Count I and repeat, re-allege, and incorporate by reference, as if fully set forth herein, the allegations of each of the preceding paragraphs set forth above.

134.    The Settlement Order was entered to approve and give effect to the Settlement Agreement.

135.    SIA never would have agreed to, and would have objected to, the Settlement Order had SIA understood that the Settlement Order pertained to or affected property interests other than the Cabin Bluff Reserved Interests.

136.    If the Settlement Agreement is voided and/or rescinded, the purpose for which the Settlement Order was entered will cease to exist and maintenance of the Settlement Order would be inequitable and unjust.  The Settlement Order should thus be vacated.

137.    The Settlement Order is an injunction that must comply with the requirements of Rule 65 of the Federal Rules of Civil Procedure, as incorporated into Rule 7065 of the Federal Rules of Bankruptcy Procedure.

138.    The  Settlement Order does not comply with Rule 65 of the Federal Rules of Civil Procedure because it fails to describe in reasonable detail, and expressly refers to other documents in describing, the acts or acts restrained or required.

139.    The  Settlement Order also does not comply with Rule 65 of the Federal Rules of Civil Procedure because its terms and meaning are impermissibly vague and unclear.

140.    Moreover, to the extent the Settlement Order is found to pertain to or to affect property interests other than the Retained Interests, the Settlement Order impermissibly and ineffectively would purport to modify the Plan.  If all of the Purchased Assets are effected by the

Settlement Order, the Settlement Order would constitute a substantial change of substance with respect to the transactions underlying the Plan, the purpose of which was to consummate the sale of the Debtors' assets. The Plan has been substantially consummated. Neither SIA nor Defendant moved to modify the Plan, and neither SIA nor Defendant had or has standing to modify the Plan. Any such plan modification would violate 11 U.S.C. § 1127 and would be void or voidable.

141.     Accordingly, to the extent the Settlement Order is found to pertain to or to affect property interests other than the Retained Interests, the Settlement Order is void and should be vacated.

## COUNT IV – REMOVAL OF CLOUD FROM TITLE (O.C.G.A. § 23-3-40 *et seq.*)

142.     Plaintiffs repeat, re-allege, and incorporate by reference, as if fully set forth herein, the allegations of each of the preceding paragraphs set forth above.

143.     Plaintiffs assert this count to remove Defendant's cloud on SIA's title to the Identified Property pursuant to O.C.G.A. § 23-3-40 *et seq.*

144.     Under the Deeds, under the APA, under the Bill of Sale, and/or under the Confirmation Order, Plaintiffs (or their successors in interest) are the lawful owners of, have title to, and are in possession of the Identified Property.

145.     Alternatively, Plaintiffs (or their successors in interest) have title by prescription to the Identified Property, under O.C.G.A. § 44-5-160 *et seq.*, by virtue of their adverse possession for at least seven years of the Identified Property under written evidence of title, including the Deeds, the APA, the Bill of Sale, and the Confirmation Order.

146.     Defendant improperly has asserted, and continues to assert, interests in the Identified Property under the Settlement Agreement and/or the Settlement Order.

147. Additionally, Defendant improperly has asserted, and continues to assert, interests in the Identified Property under the Plan, the APA, the Trust Agreement, and/or other documents or instruments executed or delivered in connection with the transfer of the Purchased Assets to SIA and its designees (collectively, the "Transfer Documents").

148. Defendant's improper interpretation and use of the Settlement Agreement, the Settlement Order, and the Transfer Documents operate to throw a cloud or suspicion upon Plaintiffs' title to the Identified Property, and have been or might continue to be vexatiously or injuriously used against Plaintiffs.

149. By reason of the Settlement Agreement and the Settlement Order, and Defendant's erroneous and improper interpretation of the Transfer Documents, Plaintiffs are unable to fully exercise their rights of ownership of the Identified Property, including their rights to convey or transfer the Identified Property.

150. Plaintiffs are entitled to judgment establishing their title in the Identified Property as against Defendant's claims under the Settlement Agreement, the Settlement Order, and/or the Transfer Documents and removing all clouds to Plaintiffs' (or their successors in interest's) title to the Identified Property existing by virtue of Defendant's improper interpretation and use of the Settlement Agreement, the Settlement Order, and/or the Transfer Documents.

## COUNT V – DECLARATION THAT DEFENDANT DID NOT OBTAIN OR ACQUIRE ANY INTERESTS IN REAL PROPERTY UNDER THE TRANSFER DOCUMENTS

151. Plaintiffs repeat, re-allege, and incorporate by reference, as if fully set forth herein, the allegations of each of the preceding paragraphs set forth above.

152. The APA provides for the transfer of all of the Debtors' interests in real property to SIA and further provides that "none" of the Debtors' interests in real property will be excluded from the transfer to SIA (and its designees).

153.    Neither the Plan, the Confirmation Order, nor any of the other Transfer Documents provided for the transfer of any real property interests to Defendant.

154.    At the Closing, all of the Debtors' interests in real property were transferred to SIA (and its designees).

155.    Alternatively, any real property interest not transferred to SIA (and its designees) at the Closing remains property of the Debtors and is to be transferred to SIA pursuant to the Plan, the APA, the Confirmation Order, and related documents.

156.    At the Closing, none of the Debtors' interests in real property were transferred to Defendant.

157.    On the effective date of the Plan, none of the Debtors' interests in real property were transferred to Defendant.

158.    Defendant asserts that any real property interest of the Debtors that was not transferred by deed to SIA (and its designees) at the Closing vested in the Liquidating Trust and is now property of the Liquidating Trust.

159.    Such real property interests in which Defendant asserts an interest include, among other things the following real property interests: (a) Parcel 2, Resort Unit, Black Banks River Residences, a condominium; (b) Parcel 38(a), Unit BCO1, Beach Club Residences, a condominium; (c) Parcel 38(b), Unit BCO2, Beach Club Residences, a condominium; (d) Parcel 42, ONResort Unit, Ocean Club Residences, a condominium; and (e) Parcel 43, BCOResort Unit, GSResort Unit, and GNResort Unit, Beach Club Residences, a condominium.

160.    As a result of Defendant's assertions regarding his and/or the Liquidating Trust's alleged interests in the Debtors' interest in real property, there exists an actual controversy

between Plaintiffs and Defendant, under 28 U.S.C. § 2201, that lies within the jurisdiction of this Court.

161.    Plaintiffs are entitled to the entry of a final judgment declaring that Defendant did not acquire any interests in real property: (a) under the Transfer Documents; (b) at the Closing; or (c) otherwise upon the effective date of the Plan.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiffs respectfully request that the Court grant them the following relief:

1.    Pursuant to Count I, enter a declaratory judgment that the Settlement Agreement and the Settlement Order purport to pertain to and/or affect only the Cabin Bluff Reserved Interests and that neither the Settlement Agreement nor the Settlement Order purports to pertain to or affect any of the other "Purchased Assets";

2.    In the alternative to granting relief pursuant to Count I, enter, pursuant to Count II, an order rescinding the Settlement Agreement;

3.    In the alternative to granting relief pursuant to Count I, enter, pursuant to Count III,  an order vacating the Settlement Order;

4.    Pursuant to Count IV, enter an order removing any cloud to Plaintiffs' (or their successors in interest's) title to the Identified Property caused by the Settlement Agreement, the Settlement Order, and/or any of the Transfer Documents;

5.    Pursuant to Count V, enter a declaratory judgment that Defendant did not acquire any interests in real property: (a) under any of the Transfer Documents; (b) at the Closing; or (c) otherwise upon the effective date of the Plan.

6.    Enter a preliminary and permanent injunction prohibiting Defendant from interfering with Plaintiffs' exercise of ownership over the Identified Property and the other

Purchased Assets (other than the Cabin Bluff Reserved Interests and the Kings Point Common Areas);

7.      Enter an order enforcing the provisions of the Plan, the Confirmation Order, and the APA;

8.      Award Plaintiffs their attorneys' fees, costs, and expenses; and

9.      Grant Plaintiffs such other relief as may be necessary and appropriate.

DATED: November 5, 2018                  HALL BOOTH SMITH, P.C.

                                         /s/ James B. Durham
                                         James B. Durham (Ga. Bar No. 235526)
                                         3528 Darien Highway, Suite 300
                                         Brunswick, Georgia 31525
                                         Phone: (912) 554-0093
                                         Fax:    (912) 554-1973
                                         Email:  jdurham@hallboothsmith.com

                                         -and-

                                         KING & SPALDING LLP

                                         Sarah R. Borders (Ga. Bar No. 610649)
                                         (Admitted *Pro Hac Vice*)
                                         Mark M. Maloney (Ga. Bar No. 468104)
                                         (Admitted *Pro Hac Vice*)
                                         Jeffrey R. Dutson (Ga. Bar No. 637106)
                                         (Admitted *Pro Hac Vice*)
                                         Kevin J. O'Brien (Ga. Bar No. 714849)
                                         (Admitted *Pro Hac Vice*)
                                         1180 Peachtree Street
                                         Atlanta, Georgia 30309
                                         Phone:  (404) 572-4600
                                         Fax:    (404) 572-5100
                                         Email:  sborders@kslaw.com
                                                 mmaloney@kslaw.com
                                                 jdutson@kslaw.com
                                                 kobrien@kslaw.com

                                         *Attorneys for Plaintiffs*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## BRUNSWICK DIVISION

| | |
|---|---|
| **In re:**<br><br>**SEA ISLAND COMPANY et al.,**<br><br>    **Debtors.** | **Chapter 11**<br>**Case No. 10-21034-EJC**<br>**Jointly Administered** |
| **SEA ISLAND ACQUISITION, LLC, SEWERS AND WELLS, LLC, MAINTENANCE FACILITY, LLC, LAUNDRY SERVICES, LLC, RAINBOW HAMMOCK, LLC, SIA PROPCO I, LLC, SIA PROPCO II, LLC, SI TRACT V, LLC, SI PARCEL OGC, LLC, AND SSI PARCEL OS, LLC,**<br><br>    **Plaintiffs,**<br><br>**v.**<br><br>**ROBERT H. BARNETT, as Trustee of the SEA ISLAND COMPANY CREDITORS LIQUIDATION TRUST,**<br><br>    **Defendant.** | **Adversary Proceeding**<br><br>**No. 18-02012-EJC** |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day electronically filed the foregoing **Second Amended Complaint** with the Clerk of the United States Bankruptcy Court for the Southern District of Georgia, Brunswick Division, through the Court's CM/ECF System that will send a notice of electronic filing to the following parties to this matter:

Robert M.D. Mercer, Esq.
Schulten, Ward, Turner & Weiss, LLP
260 Peachtree Street, N.W., Suite 2700
Atlanta, GA 30303
*Attorney for Defendant*

35

DATED: November 5, 2018             HALL BOOTH SMITH, P.C.

                                    /s/ James B. Durham
                                    James B. Durham (Ga. Bar No. 235526)
                                    3528 Darien Highway, Suite 300
                                    Brunswick, Georgia 31525
                                    Phone: (912) 554-0093
                                    Fax:     (912) 554-1973
                                    Email:  jdurham@hallboothsmith.com
                                    *Attorney for Plaintiffs*

*In re: Sea Island Company et al.*
**Chapter 11 | Case No. 10-21034-EJC | Jointly Administered**

*Sea Island Acquisition, LLC, et al. v. Robert H. Barnett, as Trustee of Sea Island Company Creditors Liquidation Trust*
**Adversary Proceeding | No. 18-02012-EJC**

**Second Amended Complaint**