# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### BRUNSWICK DIVISION

| | |
|---|---|
| In re:<br><br>**SEA ISLAND COMPANY et al.,**<br><br>    **Debtors.** | **Chapter 11**<br>**Case No. 10-21034-EJC**<br>**Jointly Administered** |
| **SEA ISLAND ACQUISITION, LLC et al.,**<br><br>    **Plaintiffs,**<br><br>**v.**<br><br>**ROBERT H. BARNETT, as Trustee of the**<br>**SEA ISLAND COMPANY CREDITORS**<br>**LIQUIDATION TRUST,**<br><br>    **Defendant.** | **Adversary Proceeding**<br><br>**No. 18-02012-EJC** |

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Plaintiffs submit this response in opposition to Defendant's Amended Motion to Dismiss for Failure to State a Claim and for Lack of Subject Matter Jurisdiction (Dkt. 51) (the "Motion to Dismiss" or "Motion").

## BACKGROUND

### I.      PROCEDURAL HISTORY

On October 19, 2018, Sea Island Acquisition, LLC ("SIA") and the other plaintiffs (collectively, "Plaintiffs") initiated this adversary proceeding to stop Defendant Robert H. Barnett, as Trustee ("Defendant") of the Sea Island Company Creditors Liquidation Trust (the "Liquidating Trust") from asserting ownership and control rights over, and to remove a cloud on title to, the real property transferred in 2010 to Plaintiffs and their affiliates pursuant to an Asset Purchase Agreement ("APA") and the Chapter 11 Plan confirmed in these cases.  Before Plaintiffs initiated

this proceeding, Defendant was publicly making claims to Plaintiffs' property in two ways. First, he asserted that, despite the undisputed intention reflected in the APA, the Chapter 11 Plan, and various documents implementing the Plan that Plaintiffs would acquire all of the Debtors' real property interests, title to property transferred by an allegedly defective deed (or by no deed at all) vested in the Liquidating Trust instead. Second, Defendant claimed that, in a settlement agreement entered into between SIA and Defendant with respect to a dispute over title to two limited, commercially-valueless sets of property rights, SIA agreed not to dispute any claim of ownership that Defendant asserted with respect to *any* of the purchased real estate, and that SIA further relinquished to Defendant "consent to transfer" rights over the *entirety* of Plaintiffs' half-billion-dollar real estate portfolio.

Due to the urgency of the harm being caused by Defendant's assertions over Plaintiffs' property, Plaintiffs filed, with their original complaint, a motion for a preliminary injunction seeking to enjoin Defendant from making his unfounded property claims. The Court held a hearing on that motion on October 30, 2018, at the end of which it entered the requested preliminary injunction. The Court specifically found, among other things, that Plaintiffs are likely to succeed on their claims—noting in particular that Defendant's purported reading of the settlement agreement is "absurd"—and that Plaintiffs would be irreparably harmed if Defendant's conduct were not enjoined.

Following the hearing, Plaintiffs filed their Second Amended Complaint to ensure that all real property disputes between Plaintiffs and Defendant are properly before the Court for final adjudication. The Second Amended Complaint seeks relief in five counts:

Count I:   Declaratory judgment that the settlement agreement (and order approving it) pertain only to one particular set of property rights (the "Cabin Bluff Reserved Interests") and not to any other real property interests;

Count II:   In the alternative to Count I, rescission of the settlement agreement;

2

Count III: In the alternative to Count I, vacatur of the order approving the settlement agreement;

Count IV: Removal of the cloud caused by Defendant's improper use of documents on title to the real property Plaintiffs acquired from the Debtors; and

Count V: Declaratory judgment that Defendant did not acquire any interests in real property under the Plan or at the closing of the APA.

On November 15, 2018, Defendant filed his Motion to Dismiss.[1]  In it, Defendant asserts, despite the Court's earlier finding that Plaintiffs are likely to succeed on their claims and that Defendant's interpretation of the settlement agreement is "absurd," that Plaintiffs' claims as to the settlement agreement (and the order approving it) fail to state a claim for relief.  Defendant further asserts that the Court lacks subject matter jurisdiction over Plaintiffs' claims with respect to the property rights Defendant purports to have acquired at the closing of the APA or under the Plan.

As outlined in detail below, all of Defendant's arguments for dismissal are unavailing. Plaintiffs have properly alleged claims for relief, and the Court has jurisdiction to hear them.

## II.    RELEVANT ALLEGATIONS IN THE SECOND AMENDED COMPLAINT

### A.    The Debtors filed for bankruptcy and sold substantially all of their assets—including ALL of their real property interests—to SIA.

On August 10, 2010, Sea Island Company and six of its affiliates (collectively, the "Debtors")—operators of a resort business in and around Sea Island and St. Simons Island—filed Chapter 11 cases in this Court (the "Bankruptcy Case").  SAC ¶¶ 15-16.  The Debtors filed the Bankruptcy Case specifically to consummate a sale of substantially all of their assets pursuant to a Court-approved sale and plan process.  SAC ¶ 17.  To that end, on September 24, 2010, the

---

[1] Defendant filed one motion just before midnight on November 14, 2018—the deadline for Rule 12(b) motions set forth on the scheduling order.  Just after midnight the next day, Defendant filed an "amended" motion to dismiss, which appears to be a more complete version of the original motion.  In this response, Plaintiffs respond to the "amended" version notwithstanding its apparent untimeliness.

Debtors filed their Amended and Restated Debtors' Joint Chapter 11 Plan (the "Plan"). SAC ¶ 18. The Plan provided for the sale of substantially all of the Debtors' assets, including all real property of the Debtors, to the successful bidder at a Court-approved auction. SAC ¶ 19. The Plan also provided for the establishment of the Liquidating Trust to receive and to distribute to creditors certain assets of the Debtors not conveyed to SIA under the APA, which consisted primarily of a negotiated cash amount to be distributed to unsecured creditors and certain causes of action. SAC ¶¶ 19, 51.

### B.      Sale of the "Purchased Assets" to SIA under the APA and the Plan

On September 15, 2010, the Court entered an order setting forth the process for the Debtors' sale of their assets and approving the form of asset purchase agreement to be entered into by the successful bidder at the auction.           SAC ¶¶ 24-25. On October 11, 2010, as required by the Court's order, the Debtors conducted an auction for the sale of substantially all of the Debtors' assets—including all right, title, and interest of the Debtors in and to all of their real property. SAC ¶ 26. Multiple bidders engaged in multiple rounds of bidding, and the auction ultimately culminated in a bid by SIA that was accepted as the highest and best bid. *Id.*

Following the auction, on October 19, 2010, SIA and the Debtors entered into the APA provided for in the Court's order. SAC ¶ 27. Pursuant to the APA, SIA agreed to purchase, and the Debtors agreed to sell—subject to confirmation of the Plan—the "Purchased Assets," as defined in the APA, for $210,723,720 in cash (prior to certain working-capital adjustments and other adjustments) plus the assumption by SIA of more than $150 million in liabilities of the Debtors. SAC ¶ 28. The "Purchased Assets" required to be transferred to SIA under the APA included all real property interests of the Debtors. SAC ¶¶ 29-34.

On November 8, 2010, the Court entered its order confirming the Plan (the "Confirmation Order"), which approved the APA and authorized and compelled the Debtors to proceed with

4

consummation of the transactions under the APA (the "Closing").  SAC ¶¶ 37-38.  On December 15, 2010, the Closing occurred.  SAC ¶ 41.  The Plan, the Confirmation Order, and the APA required the Debtors to deliver deeds to SIA (or its designee) conveying to SIA (or its designee) all of the real property and real property rights of the Debtors.  SAC ¶ 36.  At Closing, the Debtors delivered deeds conveying to the SIA Parties all real property interests then known to SIA as belonging to the Debtors (the "Deeded Property").  SAC ¶ 43.  SIA thereafter recorded those deeds (the "Deeds"), along with the Confirmation Order, in the real property records of the relevant counties.  SAC ¶¶ 40, 43.  At Closing, the Debtors also executed a Bill of Sale, Assignment and Assumption Agreement (the "Bill of Sale"), which conveyed all of the Purchased Assets, including all real property owned by the Debtors, to SIA and its designees.  SAC ¶ 42.

Also at Closing, the Liquidating Trust was created pursuant to a Trust Agreement.  SAC ¶ 52.  No document purporting to transfer any real property interest of the Debtors in favor of the Liquidating Trust was ever contemplated, requested by the Trustee, prepared, executed or delivered in connection with the Closing or consummation of the Plan—or at any time thereafter. SAC ¶ 53.

### C.    Post-closing discovery of additional "Purchased Assets"

After Closing, SIA discovered two parcels of real property interests of the Debtors that were "Purchased Assets" under the APA but for which SIA did not receive deeds:

- the "Cabin Bluff Reserved Interests," consisting of certain reversionary interests in real property belonging to members of the Jones family known as Cabin Bluff (SAC ¶¶ 54-56); and

- the "Kings Point Common Areas," consisting of the common areas of a subdivision developed by the Debtors that the Debtors had intended, but failed, to transfer to the subdivision's property owners' association, Kings Point Property Owners Association, Inc. ("Kings Point POA"), years before bankruptcy (SAC ¶¶ 57-60).

5

SIA determined that neither of these sets of property interests had commercial value to it (other than potential "hold up" value that the company determined would be inappropriate to exact). SAC ¶¶ 56, 60. SIA thus agreed to transfer the Cabin Bluff Reserved Interests to the Jones family members and to transfer the Kings Point Common Areas to Kings Point POA. *Id.* Defendant, however, asserted that (contrary to the Plan, APA, and Confirmation Order) the Liquidating Trust had acquired the Cabin Bluff Reserved Interests and the Kings Point Common Areas. SAC ¶ 61. He refused to cooperate in transferring the interests to the proper owners and instead sought to extract payments from them. *Id.*

### D.        SIA's Motion to Clarify and the Contested Matter

On March 18, 2014, SIA filed its Motion to Clarify Provisions Relating to Implementation of the Confirmed Plan (the "Motion to Clarify"), seeking clarification from the Court that the Cabin Bluff Reserved Interests and the Kings Point Common Areas were "Purchased Assets" under the APA that SIA could properly convey to the Cabin Bluff owners and Kings Point POA. SAC ¶ 62. Defendant filed a "preliminary response" to the Motion to Clarify, requesting that the Court apply Rule 7016 of the Federal Rules of Bankruptcy Procedure to the proceeding initiated by the Motion to Clarify (the "Contested Matter") and allow discovery in the Contested Matter. SAC ¶ 63.

On April 10, 2014, the Court held a hearing on the Motion to Clarify and the Trustee's request for discovery. SAC ¶ 64. During the April 10, 2014 hearing, the Court expressly and plainly limited the Contested Matter to two "instances" of property interests—the Cabin Bluff Reserved Interests and the Kings Point Common Areas—and refused to expand the Contested Matter to include all "Purchased Assets" under the APA. SAC ¶ 65. The Court granted the Trustee's request for discovery in the Contested Matter and allowed the parties to engage in

6

discovery with respect to the Cabin Bluff Reserved Interests and the Kings Point Common Areas. *Id.*

On May 16, 2014, Kings Point POA filed a response to the Motion to Clarify and sought to intervene in the action, asserting that the Kings Point Common Areas were conveyed to SIA under the APA and that SIA therefore could properly convey the Kings Point Common Areas to Kings Point POA. SAC ¶ 66. The Court permitted Kings Point POA to intervene in the Contested Matter, and again noted that the scope of the dispute in the Motion to Clarify was limited to two properties. *Id.*; Order Granting Kings Point POA's Mot. to Intervene (Bankruptcy Case Dkt. 1217) at 2-3.

### E. SIA's and Defendant's settlement of the Contested Matter

Defendant indicated to the Court (at the April 10, 2014 hearing) and separately to SIA that he intended to engage in significant discovery and protracted litigation in the Contested Matter, thus forcing SIA to incur substantial expense to determine title to property in which it sought no commercial interest. SAC ¶ 68. SIA decided to settle the Contested Matter because it determined that continuing to litigate over the Cabin Bluff Reserved Interests and the Kings Point Common Areas, while a noble pursuit, was not worth the cost of litigation. SAC ¶ 69. Accordingly, after a year of discovery, SIA agreed that it would not assert ownership rights with respect to the Cabin Bluff Reserved Interests or the Kings Point Common Areas, fully understanding that Kings Point POA would continue to litigate ownership of the Kings Point Common Areas. SAC ¶ 70.

On August 19, 2015, SIA and Defendant entered into an agreement (the "Settlement Agreement") to settle the Contested Matter. SAC ¶ 71. Neither SIA nor Defendant received cash or any other property interest as consideration under the Settlement Agreement. SAC ¶ 72. Instead, SIA and Defendant provided mutual releases, and SIA agreed not to assert property ownership rights in the Cabin Bluff Reserved Interests or the Kings Point Common Areas. *Id.*

7

On October 16, 2015, Defendant unilaterally filed a motion seeking approval of the Settlement Agreement.  SAC ¶ 73.  SIA filed a timely objection on the ground that Defendant's proposed order was potentially ambiguous insofar as it did not clarify that "SIA's Asserted Contested Matter Rights" should exclude the Kings Point Common Areas, which SIA already had purported to convey by deed to Kings Point POA.  SAC ¶ 75.  In response to SIA's objection and objections filed by others, the Court entered, on December 15, 2015, its Amended Order Granting the Motion to Approve the Compromise and Settlement Pursuant to Federal Rule of Bankruptcy Procedure 9019 (the "Settlement Order").  SAC ¶ 76.

### F.      Kings Point POA's continued litigation of the Contested Matter

Following the Court's entry of the Settlement Order, Kings Point POA and Defendant continued to actively litigate their respective positions with respect to the Kings Point Common Areas.  SAC ¶ 77.  On March 4, 2016, following a hearing on the merits of the remaining issues in the Motion to Clarify, the Court entered its Order on Motion to Clarify granting the Motion to Clarify and ruling that, because the Liquidating Trust had not received any interest in any real property of the Debtors pursuant to the terms of the Plan, the Kings Point Common Areas be conveyed by deed to SIA and that Kings Point POA thereafter could record its deed, previously received from SIA, for the property.  SAC ¶¶ 79-80.

On April 4, 2016, the Trustee filed a Notice of Appeal with respect to the Order on Motion to Clarify, which commenced an appeal of that order to the United States District Court for the Southern District of Georgia (*Barnett v. Kings Point Property Owners Ass'n*, No. 2:16-cv-46 (S.D. Ga.)).  SAC ¶ 81.  During the appeal, the parties reached an agreement in principle to settle their dispute.  SAC ¶ 83.  Although the parties represented to the District Court that a settlement had been reached, the Trustee later refused to execute a definitive settlement agreement unless the agreement was conditioned upon the vacatur of the Order on Motion to Clarify (a requirement that

had not been discussed when the parties reached their agreement to settle). *Id.* The appeal and Motion to Enforce Settlement Agreement are both still pending.[2]

### G.    Defendant's recent claim to all "Purchased Assets"

Since the time of the Closing on December 15, 2010 through and including the present date (more than seven years), SIA has continuously exercised all incidents of ownership over the Deeded Property, including by occupying the Deeded Property, investing more than $170 million in new capital in the Deeded Property, using the Deeded Property in connection with SIA's business, maintaining the repair of the Deeded Property, paying all assessed taxes on the Deeded Property, maintaining utilities with respect to the Deeded Property, insuring the Deeded Property, and reflecting the ownership of the Deeded Property on its books and records. SAC ¶ 84. In addition, in the years prior to and after the entry of the Settlement Order, SIA also transferred, conveyed, and/or encumbered various portions of the Deeded Property, some of which was held for sale, including as follows:

- SIA (and its designees) have sold dozens of lots acquired from the Debtors since the Closing;

- SIA (and its designees) also conveyed property before and after the Settlement Agreement to other affiliates and related parties; and

- In 2014, SIA and certain of its affiliates also executed a deed to secure debt with respect to a significant amount of the Deeded Property to Metropolitan Life Insurance.

SAC ¶ 85.

In stark contrast, Defendant has never exercised ownership over the Deeded Property or over any other property constituting the "Purchased Assets":

---

[2] Just in the past week, Defendant asked the district court to stay the appeal altogether while this adversary proceeding is pending. *See* Minute Entry, *Barnett v. Kings Point POA*, No. 2:16-cv-46 (S.D. Ga. Nov. 16, 2018), ECF No. 57.

- Defendant never requested, obtained or recorded a deed purporting to convey to the Liquidating Trust the Deeded Property or any of the other "Purchased Assets;"

- Defendant never occupied or used the Deeded Property or any of the other "Purchased Assets;"

- Defendant never purchased or otherwise obtained title insurance with respect to the Deeded Property or any of the other "Purchased Assets;"

- Defendant never purchased or otherwise obtained property insurance covering any portion of the Deeded Property or any of the other "Purchased Assets;"

- Defendant never paid taxes assessed on the Deeded Property or any of the other "Purchased Assets;" and

- Defendant never attempted to maintain, repair, or care for the Deeded Property or any of the other "Purchased Assets."

SAC ¶ 87.

Nevertheless, in June 2018, in a phone conversation with SIA's counsel and then in a letter dated June 14, 2018 Defendant asserted to SIA for the first time that the Settlement Agreement and the Settlement Order pertain not only to the Cabin Bluff Reserved Interests but to all of the "Purchased Assets" under the APA—that is, Defendant asserted that SIA relinquished, and agreed to be enjoined from asserting, its ownership rights with respect to all $530 million worth of the "Purchased Assets." SAC ¶ 91. On June 18, 2018, following a request by SIA's counsel for more information on Defendant's surprising position, Defendant's attorney sent a letter to SIA's counsel again asserting that the Settlement Agreement and the Settlement Order pertain to all of the "Purchased Assets" under the APA. SAC ¶ 92. Specifically, the June 18, 2018 letter asserts that the term "SIA's Asserted Contested Matter Rights," as used in the Settlement Agreement and the Settlement Order, means all of the "Purchased Assets" because SIA "asserted" its general right to the "Purchased Assets" in the Contested Matter. *Id.* In a third letter dated August 22, 2018 from Defendant's attorney to SIA's general counsel, Defendant reiterated his purported interpretation of the Settlement Agreement and the Settlement Order and suggested that SIA was in "criminal

10

contempt" of the Settlement Order for not acquiescing to Defendant's purported interpretation of the documents.  SAC ¶ 93.

The Trustee grossly misconstrues the Plan, the Confirmation Order, Judge Dalis' Order on the Motion to Clarify as well as the plain language of the Settlement Agreement and the Settlement Order.  The only interests of SIA that are affected by the Settlement Agreement and Settlement Order are "SIA's Asserted Contested Matter Rights."  In the Settlement Agreement, the term "SIA's Asserted Contested Matter Rights" is defined as "all rights SIA asserts in the Motion to Clarify or otherwise in the Contested Matter including, but not limited to, the [Cabin Bluff] Reserved Interests (as that term is defined on page three of the Motion to Clarify)," except for the Kings Point Common Areas (which are separately excluded).  SAC ¶ 95.  Importantly, the definition of "SIA's Asserted Contested Matter Rights" references all rights SIA "*asserts*" (present tense) in the Motion to Clarify.  SAC ¶ 87.  At the time of the execution of the Settlement Agreement, consistent with the Court's direction at the April 10, 2014 hearing, the only rights SIA asserted in "the Motion to Clarify or otherwise in the Contested Matter" were the Cabin Bluff Reserved Interests and the Kings Point Common Areas.  SAC ¶ 98.  Because the Kings Point Common Areas are excluded from the definition of the "SIA's Asserted Contested Matter Rights," that term encompasses only the Cabin Bluff Reserved Interests.  *Id.*

### H.      Defendant's attempts to frustrate SIA's business and to extract money from SIA

The Trustee has no ownership rights in any real property previously owned by the Debtors. And yet, SIA has learned that the Trustee has, time and again, during the pendency of the Contested Matter, and in many cases after the March 4, 2016 Order on Motion to Clarify, extracted payments from third parties seeking to transfer property previously owned by the Debtors.  SAC ¶¶ 88-89.

A review of those transactions reveals two important facts.  First, despite representing that the Liquidating Trust owns or otherwise has interests in the "Purchased Assets," Defendant has avoided ever conveying any purported interests in the "Purchased Assets" by warranty deed and instead used only quit claim deeds, calling into question whether he truly believes he actually has a valid title interest, which the Court held in the March 4, 2016 Order on Motion to Clarify that he does not.  SAC ¶ 108.  Second, the value extracted by the Trustee for providing a quit claim deed more closely reflects a "hold up" value with respect to property interest than "ownership" interest of a rightful owner of the property.  *See* SAC ¶ 89.

Now, Defendant has turned his attention to attempting to extract payment from SIA based on his twisted interpretation of the Settlement Order.  SAC ¶ 109.  In an effort to leverage a payment from SIA, the Trustee is using the injunctive language in the Settlement Order (as he purports to interpret it) to frustrate SIA's day-to-day business and interfere with its commercial relationships with third parties. SAC ¶¶ 110-118.

## ARGUMENT

### PLAINTIFFS STATED A CLAIM IN EACH COUNT OF THEIR COMPLAINT, AND THE COURT HAS JURISDICTION OVER EACH COUNT.

In his Motion, Defendant alternates between arguing that Plaintiffs' Second Amended Complaint fails to state a claim for relief with respect to certain (but not all) claims and that the Court lacks subject matter jurisdiction over certain (but not all) claims.  Defendant does not clearly delineate the category in which each of his arguments falls—and he does not even articulate the legal standard governing his subject matter jurisdiction assertions.  To be clear, each type of Defendant's arguments is governed by a separate rule and standard: failure to state  a claim is under Rule 12(b)(6), and lack of subject matter jurisdiction under Rule 12(b)(1).

12

A complaint will overcome a motion to dismiss under Rule 12(b)(6) so long as it contains "'enough fact to raise a reasonable expectation that discovery will reveal evidence of' the necessary element[s of the claims]." *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295-96 (11th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). When considering such a motion, "'the pleadings are construed broadly' and that the allegations in the complaint are viewed in the light most favorable to the plaintiff." *Id.* at 1295 (citation omitted) (quoting *Levine v. World Fin. Network Nat'l Bank*, 437 F.3d 1118, 1120 (11th Cir. 2006)). Moreover, a complaint may not be dismissed under Rule 12(b)(6) "simply because 'it strikes a savvy judge that actual proof of those facts is improbable.'" *Id.* (quoting *Twombly*, 550 U.S. at 556). Under Rule 12(b)(1), a court is required "merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion." *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990) (alteration in original) (quoting *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)).

Plaintiffs' Second Amended Complaint properly states claims for relief in each of its counts, and the Court has subject matter jurisdiction over each aspect of those claims. Consequently, Defendant has not shown that dismissal is warranted under either Rule 12(b)(6) or Rule 12(b)(1).

### A. Count I properly states a claim for a declaration that Defendant's absurd reading of the Settlement Agreement and Settlement Order is wrong.

In Count I of their Second Amended Complaint, Plaintiffs seek a declaratory judgment that the Settlement Agreement and Settlement Order purport to affect only the Cabin Bluff Reserved Interests and that neither the Settlement Agreement nor the Settlement Order purports to affect any of the other real estate formerly belonging to the Debtors. Plaintiffs seek this declaration in the face of Defendant's tortured interpretation of those documents as giving him control over the

entirety of the half-billion-dollar real estate portfolio that Plaintiffs purchased from the Debtors under the APA and Plan.

After Defendant articulated his purported "interpretation" at the hearing on Plaintiffs' preliminary injunction motion, the Court rejected the interpretation outright, noting that it was absurd and illogical.  Oct. 30, 2018 Tr. 209:5-12.  Nevertheless, in his Motion to Dismiss, Defendant persists.  He asserts exactly the same absurd interpretation to argue that Plaintiffs have not even stated a claim under Count I.  On the contrary, Plaintiffs not only have stated a claim; as the Court already has found, they are "very likely" to prevail on it.  *See id.* at 299:24-300:7 ("I find that it is very likely that a correct interpretation of the settlement agreement . . . was [that it was] intended to be limited to the two categories of property interest . . . and that it was not intended to restrict the plaintiffs from conveying all of the other property they acquired as part of the purchase and sale agreement.").

Defendant's purported interpretation of the Settlement Agreement and Settlement Order turns on the meaning of the term "SIA's Asserted Contested Matter Rights."   The Settlement Agreement defines that term as follows:

> all rights SIA asserts in the Motion to Clarify or otherwise in the Contested Matter including, but not limited to, the Reserved Interests (as that term is defined on page three of the Motion to Clarify) (all such rights shall be collectively referred to as the "SIA's Asserted Contested Matter Rights"); for the avoidance of doubt, SIA's Asserted Contested Matter Rights shall not include the Common Areas (as that term is defined in paragraph two of the Kings Point POA Preliminary Response), and nothing in the Agreement shall prejudice the rights of Kings Point POA or the Liquidation Trustee with respect to the Common Areas.

Settlement Agreement [Bankruptcy Case Dkt. 1409] ¶ 1, at 3, quoted in SAC ¶ 95.

14

Defendant's entire argument is that the "plain and unambiguous language" in this passage makes the term "SIA's Asserted Contested Matter Rights" mean *all* of the property rights Plaintiffs purchased under the APA.  Mot. at 13, 17.  Defendant bases this interpretation on discovery responses SIA served early on in the Contested Matter (discovery responses not referenced in the Second Amended Complaint and not properly before the Court on Defendant's Rule 12(b)(6) motion), in which SIA articulated its basis for seeking relief with respect to the Cabin Bluff Reserved Interests and the Kings Point Common Areas as its acquisition of "all" real property interests under the APA.  *See* Mot. at 16-17 & n.25.  As alleged in the Second Amended Complaint, however, "[a]t the time of the execution of the Settlement Agreement, the only rights SIA was asserting in 'the Motion to Clarify or otherwise in the Contested Matter' were the Cabin Bluff Reserved Interests and the Kings Point Common Areas."  SAC ¶ 98.  Accordingly, in defining "SIA's Asserted Contested Matter Rights" by reference to the rights SIA "asserts" (in the present tense), the Settlement Agreement limits the term to the two sets of property interests then at issue (before then excluding the Kings Point Common Areas from the definition).

Defendant attempts to escape this reading of the Settlement Agreement (what he derisively calls the "verb-tense argument") in two ways.  *First*, he disputes Plaintiffs' allegation that "[a]t the time of the execution of the Settlement Agreement," in August 2015, "the only rights SIA was asserting" were the two at issue.  *See* Mot. at 23 & n.26 (citing SAC ¶ 98).  He purports to do so on the basis of a discovery response (not before the Court) served in June 2014—well over a year earlier.  *Id.*  Such a factual dispute, however, cannot be resolved in Defendant's favor on his motion

15

to dismiss.  *See, e.g.*, *Watts*, 495 F.3d at 1295 (explaining that, on Rule 12(b)(6) motion to dismiss, plaintiff's factual allegations are accepted as true).[3]

*Second*, Defendant argues that rules of grammar allow for the use of the present tense in describing what a superseded pleading "asserts."  *Id.* at 24.  Defendant's only support for this argument is citation to a handful of cases in which district courts referred to a superseded pleading's contents in that way.  Mot. at 24 & n.28.  Defendant does not cite or otherwise recognize the many cases doing just the opposite—*e.g.*:

- *Cooper v. Principi*, 71 F. App'x 73, 76 (1st Cir. 2003) ("Although **Cooper asserts in his reply brief** that he was not removed from his job, . . . this assertion is belied by statements in Cooper's **initial brief, where he asserted** that he 'was separated from the military under false pretenses' . . . .");

- *Johnson v. Hamilton Point Prop. Mgmt., LLC*, No. 1:17-cv-349, 2017 WL 8186857, at *3 (N.D. Ga. Nov. 8, 2017) ("Plaintiff's **Amended Complaint asserts** entirely different factual allegations and theories of recovery than those that **he asserted in his original Complaint**.");

- *Fresh v. Diamond Dev. Invs., Inc.*, No. 1:13-cv-2657, 2015 WL 1046128, at *3 (N.D. Ga. Mar. 9, 2015) ("Plaintiff's **original Complaint asserted** claims for unpaid overtime under FLSA, and Plaintiff's **Amended Complaint asserts** the exact same FLSA overtime claims.");

- *Paxton v. Morrow's Inc.*, No. 8:08-cv-189, 2008 WL 3992335, at *2 (M.D. Fla. Aug. 27, 2008) ("[W]hile Count III of **the initial complaint asserted** a claim for recovery for unpaid wages under the Florida Statutes, Count III of **the amended complaint asserts** a claim for a statutory collective action pursuant to 29 U.S.C. § 216(b)."); and

- *Bolin v. Superior Well Servs., Inc.*, No. 7:08-cv-1100-, 2010 WL 11470888, at *5 (N.D. Ala. Mar. 25, 2010) ("That **the amendment asserts** a claim against Superior, Inc. for failing to provide a safe place to work . . . is of little consequence, especially because Count Four of **the initial Complaint asserted** negligence . . . .").

---

[3] Alternatively, the Court should consider the documents already in the evidentiary record that show that SIA's subsequent discovery requests narrowed the definition of "interests at issue" to include only the same two specific properties that, by then, *everyone* had agreed were the sole subject of the ongoing litigation.  *See* Prelim. Inj. Hr'g Exs. 12-14; Oct. 30, 2018 Tr. 33:22-34:4; 38:8-10.

If these disparate lines of cases prove anything, it is that the Settlement Agreement's use of the present-tense "asserts" suggests an ambiguity.[4]  As Plaintiffs allege in their Second Amended Complaint (SAC ¶ 123), every applicable rule of contract construction compels resolving that ambiguity in Plaintiffs' favor:

- The Settlement Agreement contains a representation and warranty, and the Settlement Order contains a finding, regarding property transfers that would have been false under Defendant's interpretation but are true under Plaintiffs' (SAC ¶¶ 99-100).  *See, e.g.*, *Sutherlin v. Sutherlin*, 802 S.E.2d 204, 209 (Ga. 2017) ("[C]ontracts must be construed in their entirety and in a manner that permits all of the terms contained therein to be consistent with one another." (quoting Schwartz v. Schwartz, 561 S.E.2d 96, 97 (Ga. 2002)).

- Defendant's interpretation would lead to the absurd conclusion that SIA gave up ownership and control over its entire real estate portfolio to settle an action over two discrete sets of property in which it had no economic interest (SAC ¶ 107).  *See, e.g.*, *Cahill v. United States*, 810 S.E.2d 480, 483 (Ga. 2018) ("The settlement agreement 'must be read reasonably, in its entirety, and in a way that does not lead to an absurd result.'" (quoting *Office Depot, Inc. v. District at Howell Mill, LLC*, 710 S.E.2d 685, 689 (Ga. Ct. App. 2011))).

- For years following the Settlement Agreement, the parties operated under the understanding that the Settlement Agreement and Settlement Order affected only the Cabin Bluff Reserved Interests: SIA continued to transfer interests in property other than the Cabin Bluff Reserved Interests and continued to otherwise exercise complete ownership over its property while Defendant never attempted to exercise control over any of the property (SAC ¶¶ 84-87).  *See, e.g.*, *Atlanta Dev. Auth. v. Clark Atlanta Univ., Inc.*, 784 S.E.2d 353, 358 n.5 (Ga. 2016) ("In general, the parties' construction of a contract, as shown by their acts and conduct, is entitled to much weight and may, in some circumstances, be conclusive." (citing *Head v. Scanlin*, 367 S.E.2d 546, 548 (Ga. 1988))).

Defendant does not contend that any of these allegations fails to support resolving an ambiguity in the Settlement Agreement in Plaintiffs' favor.  Instead, either he doubles-down on his argument that "SIA's Asserted Contested Matter Rights" is not ambiguous in the first place, or he disputes the veracity of the allegations.  Neither of these arguments is sufficient to show that Count I of the Second Amended Complaint fails to state a claim.

---

[4] Indeed, the Court already has found the Settlement Agreement "to be a highly ambiguous document."  Oct. 30, 2018 Tr. 278:15.

17

**B.**   **Defendant does not challenge the sufficiency of Count II, seeking rescission of the Settlement Agreement.**

Under the heading "COUNT II," Defendant's Motion argues that the Settlement *Order* "Can Stand Without the Settlement Agreement." Mot. at 25. But Count II of Plaintiffs' Second Amended Complaint seeks, in the alternative to Count I, rescission of the Settlement *Agreement* on the ground that, if the Settlement Agreement's language can be construed as Defendant posits, the parties never had a meeting of the minds and the Agreement is thus invalid. *See, e.g.*, *Graham v. HHC St. Simons, Inc.*, 746 S.E.2d 157, 160 (Ga. Ct. App. 2013) ("A contract is unenforceable where there is no meeting of the minds between the parties regarding a material element thereof." (quoting *Coca-Cola Bottlers' Sales & Servs. Co. v. Novelis Corp.*, 715 S.E.2d 692, 698 (Ga. Ct. App. 2011))). Count II seeks no relief whatsoever with respect to the Settlement Order. As Defendant makes no arguments with respect to the relief Count II seeks—rescission of the Settlement Agreement—his Motion to Dismiss with respect to that count (to the extent it is asserted) should be denied.

**C.**   **Count III states a claims for vacatur of the Settlement Order.**

In Count III of the Second Amended Complaint, Plaintiffs seek, in the alternative to Count I, vacatur of the Settlement Order on the independent grounds that (*i*) if the Settlement Agreement is rescinded (as Plaintiffs seek in Count II), the Settlement Order necessarily should also be vacated under Rules 60(b)(5) and (6) and (*ii*) the Settlement Order is an otherwise invalid injunction because it violates Rule 65(d)(1).

**1.**   *If the Settlement Agreement is invalid, the Settlement Order should be vacated.*

Under his "COUNT II" heading, Defendant asserts that Plaintiffs' first ground for vacating the Settlement Order—the invalidity of the underlying Settlement Agreement—is "an untimely Rule 60(b)(1) argument." Mot. at 25. Plaintiffs, however, do not seek to vacate the Settlement

Order under Rule 60(b)(1)—which authorizes a court to relieve a party from a final order due to "mistake, inadvertence, surprise, or excusable neglect."  Rather, as shown in the Second Amended Complaint (and also in Plaintiffs' preliminary injunction motion), Plaintiffs seek relief under Rules 60(b)(5) and (6)—which allow the Court to vacate the Settlement Order because "applying it prospectively is no longer equitable" and for "any other reason that justifies relief."  Unlike motions under Rule 60(b)(1), requests under Rules 60(b)(5) and (6) are not subject to a one-year deadline but are simply required to be made "within a reasonable time."  *See* Fed. R. Civ. P. 60(c)(1).  Defendant does not assert, nor could he, that this action—brought promptly after Plaintiffs learned of Defendant's expansive interpretation of the Settlement Agreement and Settlement Order—fails to satisfy this standard.

Citing *Stancu v. Starwood Hotels & Resorts Worldwide, Inc.*, 672 F. App'x 362 (5th Cir. 2016), Defendant also suggests that vacatur of a consent judgment for failure of meeting of the minds necessarily must be brought under Rule 60(b)(1).  In *Stancu*, the Fifth Circuit simply affirmed, in an unpublished decision, a district court's application of Rule 60(b)(1) to a pro se plaintiff's unspecified motion to undo a settlement for lack of meeting of the minds.  The court never considered the applicability of other Rule 60(b) provisions, let alone held that other provisions could not apply.  Moreover, contrary to Defendant's characterization, Plaintiffs do not allege in Count III that the Settlement *Order* lacked a meeting of the minds.  Plaintiffs contend that, if the Settlement *Agreement* so fails, then the Settlement Order can no longer fairly stand.  The law does not require this Court to enforce a Settlement Order against Plaintiffs even after it determines that the Settlement Agreement giving rise to that Order was invalid.

### 2. *The Settlement Order violates Rule 65(d)(1).*

Rule 65(d)(1) provides that "[e]very order granting an injunction . . . must . . . (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or

other document—the act or acts restrained or required."  The Second Amended Complaint alleges that the Settlement Order's injunctive provisions violate these requirements because they incorporate, without further explanation, the ambiguous definition of "SIA's Contested Matter Rights" from the Settlement Agreement, which in turn defines that term by reference not only to another document ("the Motion to Clarify") but also to unspecified litigation proceedings ("otherwise in the Contested Matter").

Defendant ignores ambiguity as a basis for invalidating the Settlement Order (which is reason enough to deny his motion).  He instead argues that Rule 65(d)(1)'s express prohibition on "referring to the complaint or other document" can be set aside in the case of consent injunctions. To support this argument, Defendant cites two cases involving the enforcement of injunctions that were found to be unambiguous and clear to the enjoined party.  *See Abbott Labs. v. Unlimited Beverages, Inc.*, 218 F.3d 1238, 1241 (11th Cir. 2000) (affirming district court's reference to other documents in construing a consent injunction that did not itself incorporate other documents); *Combs v. Ryan's Coal Co.*, 785 F.2d 970, 978 (11th Cir. 1986) (explaining that the court could "disregard the defect" of an injunction's incorporation of another document because "it is clear from the totality of the language in the various documents that the contemnors understood their obligations under the injunction").  By contrast, the Settlement Order does not even specifically refer to the documents from which Defendant says the definition of "SIA's Asserted Contested Matter Rights" can be gleaned (e.g., the discovery response Defendant points to as the sole basis for his argument).  And, moreover, Plaintiffs allege that they *never* understood the Settlement Order to pertain to property other than the Cabin Bluff Reserved Interests.[5]  Accepting that

---

[5] As noted above, the Court already has found the Settlement Order to be "highly ambiguous." Oct. 30, 2018 Tr. 278:15.

allegation as true, Count III necessarily states a claim that the Settlement Order violates Rule 65(d)(1).  *See, e.g.*, *Fla. Ass'n of Rehab. Facilities, Inc. v. Fla. Dep't of Health & Rehab. Servs.*, 225 F.3d 1208, 1223 (11th Cir. 2000) ("The specificity requirement of Rule 65(d) is no mere technicality . . . .  An injunction must be framed so that those enjoined know exactly what conduct the court has prohibited and what steps they must take to conform their conduct to the law.").

### D.   Count IV properly asserts a cloud-on-title claim.

In Count IV, Plaintiffs seek to remove the cloud on title to the real property they acquired under the APA caused by Defendant's improper interpretations of documents.  The property at issue includes all of the Debtors' real property interests—title to all of which has been clouded by Defendant's improper interpretations of the Settlement Agreement and Settlement Order and title to a subset of which has been clouded by Defendant's improper interpretations of the Transfer Documents (i.e., the APA, the Plan, the Trust Agreement, and the deeds conveying those property interests).  Defendant asserts a panoply of different arguments directed to different portions of the cloud-on-title claims—asserting that Count IV fails to state a claim with respect to some properties and that the Court lacks jurisdiction with respect to others.  All of Defendant's arguments fail.

#### 1.   *Count IV states a cloud-on-title claim with respect to all property.*

In arguing that Count IV fails to state a claim, Defendant asserts that Plaintiffs' cloud-on-title claims are a "backdoor attempt" to improperly modify the Settlement Order.  Count IV, however, is asserted on the basis of the Settlement Order being construed properly (i.e., as affecting only the Cabin Bluff Reserved Interests) or being vacated.  As explained above, the Second Amended Complaint sufficiently states a claim for that relief, and Count IV thus properly seeks additional relief.

Defendant next argues that the Second Amended Complaint fails to allege an element of the cloud-on-title cause of action: that Plaintiffs "cannot immediately or effectually maintain or

21

protect [their] rights by another course of proceeding open" to them.  Mot. at 28 (quoting O.C.G.A. § 23-3-42(1)).  This statutory provision is satisfied, however, when the cloud-on-title defendant is not in possession of the property at issue—because a defendant in possession is subject to an ejectment proceeding, which would be an adequate legal remedy for the plaintiff.  *See, e.g.*, *Mentone Hotel & Realty Co. v. Taylor*, 130 S.E. 527, 529 (Ga. 1925).  The Second Amended Complaint makes clear that Defendant does not possess or occupy any of the real property at issue: "Defendant never occupied or used the Identified Property or any of the other 'Purchased Assets.'" SAC ¶ 87(b).  The Second Amended Complaint thus pleads facts sufficient to show that O.C.G.A. § 23-3-42(1) is satisfied.[6]

Finally, Defendant baldly argues that Plaintiffs' alternative allegation that they have "title by prescription" (i.e., adverse possession) to certain property is "nothing more than a legal conclusion masquerading as a fact."  Mot. at 28-29.  Defendant, however, ignores the Second Amended Complaint's factual allegations supporting Plaintiffs' claim of prescriptive title (as set forth in O.C.G.A. § 44-5-160), including continuous and open occupation of the property for more than seven years.  *See* SAC ¶ 84.[7]

---

[6] Moreover, the Court already has found, in entering the preliminary injunction, that Defendant's assertions with respect to Plaintiffs' property are causing Plaintiffs irreparable harm that cannot be remedied through damages or other legal relief.  *See* Oct. 30, 2018 Tr. 277:12-14.

[7] The time to establish adverse possession in Georgia is seven years if the possession is "under written evidence of title," O.C.G.A. § 44-5-164; otherwise, the time is 20 years, *id.* § 44-5-163.  In a footnote, Defendant argues that, to the extent any of the deeds under which Plaintiffs possessed their property were defective, those deeds could not serve as "written evidence of title" (i.e., "color of title").  Mot. at 30 n.30.  Georgia law, in fact, is just the opposite: "Color of title is a writing upon its face professing to pass title, but which does not do it, either from want of title in the person making it, or from the defective conveyance that is used—a title that is imperfect, but not so obviously so that it would be apparent to one not skilled in the law."  *Gigger v. White*, 586 S.E.2d 242, 245 (Ga. 2003) (quoting *Ponder v. Ponder*, 571 S.E.2d 343, 346 (Ga. 2002)).

2.      ***Plaintiffs have standing to assert, and the Court has jurisdiction to decide, the cloud-on-title claim as to property Plaintiffs transferred.***

Defendant also argues that Plaintiffs lack standing to pursue, and that the Court thus lacks jurisdiction to decide, the cloud-on-title claims as to a limited subset of property that Plaintiffs have transferred to third parties.  In making this argument, Defendant attempts to cast Plaintiffs' claim with respect to this property as an assertion of "the rights of third parties."  Mot. at 29. Defendant ignores Plaintiffs' own injuries—and their own rights—which are more than sufficient to confer Article III standing.

Injury sufficient to confer standing must merely be "particularized"—that is, consist of "some actual or threatened injury" that "the plaintiff 'personally has suffered.'"  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982)).  Plaintiffs are not required to use magic words or phrases to adequately plead standing—what matters is the substance of the factual allegations.  *See, e.g.*, *Smith v. Meese*, 821 F.2d 1484, 1496 (11th Cir. 1987) ("Dismissing the complaint for the failure to choose the correct words [to plead standing], when the meaning of the allegations are clear, would return us to the days of the common law forms of pleading."). Moreover, these allegations must be accepted as true on a motion to dismiss under Rule 12(b)(1) for lack of Article III standing.  *Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys.*, 524 F.3d 1229, 1232-33 (11th Cir. 2008).  The Second Amended Complaint and the record in this case are replete with examples of injury Plaintiffs are suffering, or are in imminent risk of suffering, due to Defendant's imposition of an improper cloud on title to the property Plaintiffs acquired, including property since conveyed to others.  As the Court already has determined, Plaintiffs are suffering and are at risk of suffering serious reputational injury from Defendant's actions.  This is even more pronounced with respect to property Plaintiffs conveyed to other parties.

Moreover, many of the properties Plaintiffs transferred were transferred by warranty deed—potentially imposing a duty on Plaintiffs to indemnify the third-party transferees in any action in which Defendant claimed an interest in the properties and potentially giving the third-party transferees the ability to hold Plaintiffs liable for any potential defects in title. *See, e.g.*, *Weiss v. Old Republic Nat'l Title Ins. Co.*, 584 S.E.2d 710, 713 (Ga. Ct. App. 2003) (explaining that conveyance of property owned by another constitutes a breach of the warranty of title contained in a warranty deed). The risk that Plaintiffs will be held liable to those third-party transferees if Defendant continues to assert interests in their property in order to receive hold-out payments is sufficient to confer Article III standing on Plaintiffs. *See Clinton v. City of New York*, 524 U.S. 417, 430-31 (1998) (holding plaintiffs had sufficiently alleged injury because challenged conduct would result in injury to third party and third party would hold plaintiffs responsible for at least part of the costs of the injury).

Further, Plaintiffs not only have the *right* to remove clouds on title to the properties they have already conveyed, they have the potential *obligation* to perfect the third-party transferees' title to those properties. By removing the clouds on those titles now, Plaintiffs are merely discharging the duties they may owe to the third-party transferees under the warranty deeds and mitigating any potential damages to those parties. Disallowing Plaintiffs from removing clouds on the titles to the all of the property now would have the effect of forcing Plaintiffs to wait until the third-party transferees invoke their rights under the relevant warranty deeds and would "subject the participants to a circuity of actions," which is an inadequate means to protect any of the participants' interests. *Robertson v. Webster*, 52 S.E.2d 511, 514 (Ga. Ct. App. 1949) (holding intermediate grantor could pursue action for breach of warranty against prior grantor although right of action passed to intermediate grantor's grantee when he conveyed the property because the only

other option was for the immediate grantor to wait until he was eventually sued by the grantee and to bring defendants into the suit). Plaintiffs thus have standing not only because they face a substantial risk of being held liable for breaching the warranty deeds, but also because they have a potential *obligation* to defend the third-party transferees' titles as against all other claiming persons. Because Plaintiffs have a duty to defend the titles to transferred property, and could face substantial liability if they do not, Plaintiffs have Article III standing to maintain an action to remove the clouds on titles to property currently possessed by their successors-in-interest.[8]

### E. The Court has not been divested of jurisdiction over Count V by an appeal of different issues in a different case.

In Count V, Plaintiffs seek a declaratory judgment that Defendant did not acquire any interests in the Debtors' real property: (a) under the APA, the Plan, or the Trust Agreement; (b) at the Closing; or (c) otherwise upon the effective date of the Plan. Defendant asserts that the filing of an appeal (by Defendant himself) in a different action—the dispute between Defendant and Kings Point POA over title to a specific property—"divests" this Court of jurisdiction over Plaintiffs' request in Count V. Defendant is wrong because this adversary proceeding and the Kings Point POA litigation are different actions that involve different matters.

---

[8] Defendant limits his argument with respect to transferred property to standing; he does not contend that Plaintiffs failed to state a claim as to that property. Nor could he. Although Defendant noted (in unsuccessfully arguing that Plaintiffs failed to plead prescriptive title) that courts have imposed a "possession" requirement for O.C.G.A. § 23-3-42 claims, that requirement is in fact just one way a plaintiff can show that it lacks an adequate remedy at law, and courts thus recognize exceptions to it. *See Mentone Hotel & Realty Co.*, 130 S.E. at 529 (explaining that the possession requirement is a shorthand way for determining whether the plaintiff has an adequate legal remedy in the form of ejectment). Thus, although Plaintiffs are not presently in possession of all of the property, the more important fact is, as discussed above, that Defendant is not in possession. Consequently, Defendant is not liable for a legal claim of ejectment, and equitable relief in the form of a removal-of-cloud proceeding is proper.

The divestiture doctrine Defendant invokes provides that the "filing of a notice of appeal . . . divests the [trial] court of its control over those aspects of the case involved in the appeal." *Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*, 341 F.3d 1292, 1309 (11th Cir. 2003) (quoting *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982)).  This rule does not apply to a trial court's jurisdiction over *different* actions, and it does not apply even in the same action to the trial court's ability to proceed with different matters.  *See, e.g.*, *id.* (trial court could proceed to the merits of causes of action not on interlocutory appeal); *Alabama v. EPA*, 871 F.2d 1548, 1553 (11th Cir. 1989) (trial court had jurisdiction to enter summary judgment even though appeal on preliminary injunction was pending); *see also In re Sabine Oil & Gas Corp.*, 548 B.R. 674, 679 (Bankr. S.D.N.Y. 2016) ("During the pendency of an appeal of a bankruptcy court order, . . . the bankruptcy court is not divested of jurisdiction to enforce or implement the order being appealed, nor is the bankruptcy court divested of jurisdiction to decide issues and proceedings different from and collateral to those involved in the appeal." (internal quotation omitted)). The Kings Point litigation is a different action, involving different parties and involving a single specific property not at issue in this case.  *See* SAC prayer ¶ 6, at 33-34 (requesting relief with respect to property "other than the Cabin Bluff Reserved Interests and the Kings Point Common Areas").

In an effort to show that these threshold divestiture requirements—same case, same matters—do not exist (or do not apply here), Defendant expounds on an order of Judge Dalis entered in the underlying Bankruptcy Case relating to a dispute between Defendant and creditor Dennie McCrary (Dkt. 994 in the Bankruptcy Case) (the "*McCrary* Order").  That order, however, serves only to demonstrate the applicability of those requirements—and why the divestiture doctrine is not at play in this case.  In the *McCrary* Order, Mr. McCrary had objected to

Defendant's fourth motion to extend the claim-objection deadline and for "related relief," Judge Dalis had overruled the objection and granted the motion, and Mr. McCrary had appealed to the district court.  While the appeal was pending, Defendant filed a fifth motion to extend and for "related relief," and Mr. McCrary again objected, including on the ground that the court was divested of jurisdiction over the fifth motion due to the appeal of the fourth motion.  The *McCrary* Order involved the court's determination of divestiture in the same action—the dispute between Defendant and Mr. McCrary over extending the claim-objection deadline and granting Defendant "related relief."  It is no wonder, then, that the court focused only on the second requirement of divestiture: whether the issues on appeal were the same as those presented in the fifth motion. Judge Dalis held that only the availability of "related relief" was at issue in the appeal, and he thus proceeded to exercise jurisdiction over the other aspects of the motion (i.e., those aspects to which the "related relief" were related).[9]

Similarly, in *Sabine*, the Bankruptcy Court for the Southern District of New York explained that divestiture applies only in the same proceeding and only to "the issue or matter that is on appeal."  548 B.R. at 679.  Even then, the court noted, the lower court is divested only of jurisdiction to alter the appealed decision, and the lower court may still act to implement or enforce the decision.  *Id.*  The court thus determined that it retained jurisdiction to confirm a plan that would release certain claims that the court previously determined the creditors' committee could

---

[9] The other cases Defendant cites similarly confirm the requirements of divestiture.  *See In re Cotton*, 250 F. App'x 968, 969-70 (11th Cir. 2007) (bankruptcy court precluded from granting a motion that it had previously denied in the same case in an order then on appeal); *In re Fountainebleau Las Vegas Holdings, LLC*, No. 09-cv-21481, 2013 WL 1147443, at *4-5 (S.D. Fla. Mar. 19, 2013) (bankruptcy court would not enforce the very district court remand order that was on appeal to court of appeals).

27

not pursue in an order then on appeal. *Id.* at 677-80. Confirming such a plan, the court held, would not alter the appealed order. *Id.* at 679.

In contrast to the *McCrary* Order and *Sabine*, this proceeding and the Kings Point litigation are different cases, involving different parties seeking different relief. The cases may involve a common legal question—interpreting the real-property-transfer provisions of the APA and Plan— but to serve different ends for different litigants. In the Kings Point case, that question was resolved to determine the Kings Point POA's ownership of the Kings Point Common Areas (and only the Kings Point Common Areas). *See* Order on Motion to Clarify (Bankruptcy Case Dkt. 1494) at 15 (ordering relief solely with respect to the Kings Point Common Areas), cited in SAC ¶ 80. In this case, however, that question will resolve Plaintiffs' ownership of all property conveyed to them by allegedly ineffective deeds *other than* the Kings Point Common Areas.

Defendant offers no explanation for how the existence of one common legal question turns two separate cases seeking different relief into one case. It does not—a fact Defendant himself has repeatedly relied on by seeking this Court's approval, after the April 4, 2016 filing of the Kings Point appeal, of real estate transactions that would also be directly affected by the legal question in the Kings Points appeal (i.e., transactions in which Defendant has purported to sell an interest in real estate conveyed to Plaintiffs by allegedly imperfect deeds or no deeds), including the following:

- Defendant's July 26, 2016 "Motion for Expedited Approval of Sale of the Liquidation Trust's Interest in Lot 16 of Sea Island Lake Cottages." *See* Bankruptcy Case Dkt. 1591; SAC ¶ 89(b).

- Defendant's September 23, 2016 "Motion for Approval of Sale of the Liquidation Trust's Interest in a Certain Right of First Refusal to S. Taylor Glover." *See* Bankruptcy Case Dkt. 1666; SAC ¶ 89(a).

28

- Defendant's September 7, 2017 "Motion for Approval of Sale of the Liquidation Trust's Interest in the Turk Property to Cottage 429, LLC." *See* Bankruptcy Case Dkt. 1732; SAC ¶ 89(c).[10]

The existence of common legal questions in different cases is a regular occurrence—the effect of which, if any, is governed by the law of preclusion, not divestiture. *See, e.g.*, *Jaffree v. Wallace*, 837 F.2d 1461, 1466-67 (11th Cir. 1988) (discussing preclusive effect of judgment that was pending on appeal in a different case); *see also* 18A Wright & Miller, *Federal Practice and Procedure* § 4433 (analyzing different problems that arise when assessing the preclusive effect of judgments pending on appeal). To the extent Judge Dalis's now-appealed Kings Point decision has any role in this case, it would solely be to implement or enforce that order—not to alter it in any way. *See Sabine*, 548 B.R. at 679. Defendant's motion as to Count V should thus be denied.

## <u>CONCLUSION</u>

For the reasons stated above, Defendant's Motion to Dismiss should be denied.

---

[10] Not only is Defendant invoking divestiture selectively, he is proactively working in the Kings Point litigation to manufacture the issue. According to their public filings, the litigants in that case reached a tentative settlement well over a year ago. *See* Mot. to Enforce Settlement Agreement at 4-11, *Barnett v. Kings Point POA*, No. 2:16-cv-46 (S.D. Ga. Aug. 17, 2018), ECF No. 44. Yet, for months, Defendant has refused to finalize it—in sisting that the appealed order be formally vacated so as to remove its potential preclusive effects. *Id.* Recently, however, Defendant has asked the district court to stay the appeal while *this* adversary proceeding is pending. *See* Minute Entry, *Barnett v. Kings Point POA*, (S.D. Ga. Nov. 16, 2018), ECF No. 57. Defendant thus seeks to keep the appealed order alive—but on hold—to invoke divestiture in this case, but then to seek that order's vacatur as soon as this case is over. Even if the divestiture doctrine could be applied in this case, Defendant should not be permitted to use it in this way.

DATED: November 21, 2018

/s/ James B. Durham
James B. Durham (Ga. Bar No. 235526)
HALL BOOTH SMITH, P.C.
3528 Darien Highway, Suite 300
Brunswick, Georgia 31525
Phone: (912) 554-0093
Fax:    (912) 554-1973
Email: jdurham@hallboothsmith.com

-and-

Sarah R. Borders (Ga. Bar No. 610649)
Mark M. Maloney (Ga. Bar No. 468104)
Jeffrey R. Dutson (Ga. Bar No. 637106)
Kevin J. O'Brien (Ga. Bar No. 714849)
KING & SPALDING LLP
1180 Peachtree Street
Atlanta, Georgia 30309
Phone: (404) 572-4600
Fax:    (404) 572-5100
Email: sborders@kslaw.com
        mmaloney@kslaw.com
        jdutson@kslaw.com
        kobrien@kslaw.com

*Attorneys for Plaintiffs*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION**

| | |
|---|---|
| In re:<br><br>**SEA ISLAND COMPANY et al.,**<br><br>    Debtors.<br><hr>**SEA ISLAND ACQUISITION, LLC,<br>SEWERS AND WELLS, LLC,<br>MAINTENANCE FACILITY, LLC,<br>LAUNDRY SERVICES, LLC, RAINBOW<br>HAMMOCK, LLC, SIA PROPCO I, LLC,<br>SIA PROPCO II, LLC, SI TRACT V,<br>LLC, SI PARCEL OGC, LLC, AND SSI<br>PARCEL OS, LLC,**<br><br>    **Plaintiffs,**<br><br>v.<br><br>**ROBERT H. BARNETT, as Trustee of the<br>SEA ISLAND COMPANY CREDITORS<br>LIQUIDATION TRUST,**<br><br>    **Defendant.** | **Chapter 11<br>Case No. 10-21034-EJC<br>Jointly Administered**<br><br><br><br><br><br><br>**Adversary Proceeding**<br><br>**No. 18-02012-EJC** |

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically filed the foregoing **Plaintiffs' Opposition to Defendant's Motion to Dismiss** with the Clerk of the United States Bankruptcy

31

Court for the Southern District of Georgia, Brunswick Division, through the Court's CM/ECF System that will send a notice of electronic filing to the following parties to this matter:

Robert M. D. Mercer                        James L. Drake, Jr.
Schulten Ward Turner & Weiss, LLP          James L. Drake, Jr., P.C.
260 Peachtree St, NW, Ste 2700             P.O. Box 9945
Atlanta, GA  30303                         Savannah, Georgia 31412

DATED: November 21, 2018          HALL BOOTH SMITH, P.C.

                                  /s/ James B. Durham
                                  James B. Durham (Ga. Bar No. 235526)
                                  3528 Darien Highway, Suite 300
                                  Brunswick, Georgia 31525
                                  Phone: (912) 554-0093
                                  Fax:    (912) 554-1973
                                  Email:  jdurham@hallboothsmith.com
                                  *Attorney for Plaintiffs*